**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EUCLID MARKET, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:19-CV-2136-HEA** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EUCLID MARKET, INC.'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION[1]**

Euclid Market, Inc. (the "Market") did not, and does not, traffic food stamps.  For more than twenty-seven years, the Market has been a small grocery store in an underserved, poverty-stricken neighborhood in North St. Louis.  Kids have grown-up going to the Market and now have kids of their own who shop at the Market.  Customers buy groceries, meat, chicken, fish, diary, produce, bread and items prepared for consumption off-site such as chicken wings, fried fish and deli items.  Customers visit the store multiple times in the same day, many times during the week, including different family members from the same households.  They like the Market, they trust the owners, they feel safe there, and they believe that the Market offers the products

---

[1]     The Market incorporates in its entirety into this Memorandum the sperate Statement of Disputed Facts and attached exhibits filed along with this memorandum.  Because the statements of disputed facts are lengthy, each is not repeated herein verbatim, however, certain specific references will be made to paragraphs in the "SODF".

they need and want at a value.[2]  This is undisputed (acknowledging that USDA believes the Market trafficked).

The USDA believes that the Market traffics in food stamps.  It relies upon an algorithm its ALERT System report and a store visit report prepared by Rick Steen, a contractor.  The USDA is so convinced that everyone who comes up as an outlier under the ALERT System algorithm is trafficking in food stamps, it terminates almost 100% of the retailers that appear on the report from the program.  Section Chief, Fred Conn, cannot remember ever not terminating a retailer brought to him by one of his field supervisors.  (SODF 33).  Field Supervisor Paul Arce can remember maybe a few times out of hundreds and hundreds of investigations where he did not recommend a sanction.  (Arce: 112;12-22; 113;13-7).  And once the retailer challenges the finding through the administrative process, the USDA decides 98.5% of the time that the retailer was trafficking.[3]  Even for the government, that is an incredible record of perceived correctness.  So difficult is the course for a retailer charged with trafficking, that only a handful of the thousands of retailers who are accused of trafficking ever survive to file suit in a federal district court[4]. This is undisputed.

But the Market has chosen to protect what has been a family business for twenty-seven years and challenge the erroneous assumptions of the USDA and its algorithm.  And they are assumptions, because the neither the USDA, nor any witness, has or will testify based upon

---

[2]      See the Affidavit of Abrehem Mahmoud at ¶3, Ex. HH ("Mahmoud Aff").

[3]      FNS Fiscal Year 2018 Year End Summary, at p. 11.

[4]      Once charged with trafficking, a retailer loses the ability to accept food stamps at the business during the pendency of the administrative review and the district court review, which can last years.  Thus, without the ability to accept food stamps at their business, stores in high-poverty neighborhoods cannot survive and end up closing.

actual knowledge that the Market has *ever* trafficked in SNAP benefits.  There is no direct evidence, so the USDA relies upon circumstantial data. That too is undisputed.

And this is not the first time that the Market has had to go against the USDA.  In 2017, the USDA investigated the Market because it came up as an outlier on the ALERT System; but based upon the Market's explanations for the transactions – the same explanations proffered here today – ***the USDA refused to proceed to termination and took no further action***.[5]

Unfortunately, two years later, again, the Market as an outlier in the algorithm has been accused, and this time terminated from the SNAP program for trafficking with admittedly no change in the manner it has conducted its business since 2017.  The only difference this time is that Fred Conn and Paul Arce were making the final decision at the USDA.  And as noted above, they never find in favor of the retailer.

The Market desires to present its evidence at trial.  In order to do so, it must establish for this Court that there are disputed issues of material fact that exist that make summary judgment inappropriate.  There are a multitude of disputed facts that make summary judgment wrong in this case, including:

> The Administrative Record ("AR") includes mistake after mistake as to the size of the Market, the food items available for sale at the Market, the availability of specials and meat bundles for sale at the Market, and the availability of shopping carts and baskets at the Market.

> That the hot prepared food items offered at the Market for off-site consumption are eligible food items, these items constitute most of the transactions at issue, and the USDA improperly considered them to be otherwise.

> The Market requested the names and addresses of the individual households identified in the transactions so it could present evidence from the households, but the USDA sought and obtained an order from this Court denying the information.

---

[5]      See, e.g., SODF 41.d.(i)-(iii).

The USDA withheld information about how it determines which retailers become outliers under the ALERT System and how it determines the good and the bad retailers, thereby preventing the Market from presenting evidence in opposition to the USDA.

The Market's customers do spend large sums on groceries, they do visit the Market multiple times a day, and family members do buy groceries at the Market multiple times a day and week, and that information does not come from statistics, but rather, it comes from the affidavits of the customers themselves.

The "comparable stores" identified by the USDA are not at all comparable because they are gas stations, not grocery stores, and they do not offer the same quantities of meat, chicken, fish, dairy, produce, and bread; they also do not accept food stamps for hot prepared items for consumption off-site such as chicken wings, fried fish and deli items, and the USDA admits that it did not know this at the time of the decision and that it would have a made a difference if they had known.

And finally, the Market has presented hundreds and hundreds of pages of receipts, records, and invoices proving that the Market legally sand properly sells eligible food items to qualified SNAP beneficiaries, in direct contrast to the generalized, hypothetical conclusions that have been the undoing of so many plaintiffs in the cases cited by the USDA.[6]

## **LEGAL STANDARD**

The Market's permanent disqualification is subject to this Court's de novo review.  See 7 U.S.C. § 2023(15) ("The suit in the United States district court ... shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue ...")  "In this trial de novo the burden of proof shifts, and plaintiffs must establish by a preponderance of the evidence that the violations did not occur." Lopez v. United States, 962 F.Supp. 1225, 1228 (N.D.Cal.1997) (citing Goodman v. United States, 518 F.2d 505, 511–12 (5th Cir.1975)). On a summary judgment motion, however, "the moving party retains the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law." Lopez, 962 F.Supp. at 1228–1229.

---

[6]     Each of these is covered in detail below.

4

With a trial de novo, where "existence of a violation is examined afresh," the parties "are not limited in their arguments to the contents of the administrative record."  Kim v. United States, 121 F.3d 1269,1274 (9th Cir.1997). "By providing the aggrieved food store with a new trial where the store may introduce evidence outside the administrative record, the statute also protects the rights and interests of the store against final adverse action without the opportunity for an adversary hearing."  Redmond v. United States, 507 F.2d 1007, 1011–1012 (5th Cir.1975).

"Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting Fed.R.Civ.P. 56(c)(2)).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial."  Torgerson, 643 F.3d at 1042 (internal quotation marks and citations omitted).

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts."  Id. (internal quotation marks and citations omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific

facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question.  Anderson, 477 U.S. at 248; St. Anthony's Med. Ctr. v. Nat'l Serv. Indus., Inc., No. 4:09CV844 HEA, 2011 WL 4600671, at *4 (E.D. Mo. Oct. 3, 2011).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson, 643 F.3d at 1042 (internal quotation marks and citations omitted).

## LEGAL ARGUMENT

### I.    Summary Judgment Should Be Denied Because There Are A Substantial Number of Disputed Facts.

Summary Judgment should be granted only when, viewing the evidence in the light most favorable to the nonmoving party, and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Samuels v. Kansas City Mo. Sch. Dist., 437 F.3d 797, 801 (8th Cir. 2006).  Because the defendant cannot present evidence of a single, specific instance of trafficking, and instead, relies upon circumstantial evidence, which the Market has refuted with direct evidence, the Court must make a credibility determination not permitted at the summary judgment stage.  Viewing that evidence in the light most favorable to the Market, and giving the Market the benefit of all reasonable inferences, summary judgment is not appropriate.

### A.    There Are Disputed Facts As To Why The Transactions Cited In The Charging Letter Are Considered "Unusual, Irregular, And Inexplicable" Because Defendant Refused To Answer Questions At Deposition.

In the Charging Letter accusing the Market with trafficking, the USDA indicated that, "Analysis of the records reveal Electronic Benefit Transfer (EBT) transactions that establish clear and repetitive patterns of unusual, irregular, and inexplicable activity for your type of

firm." (Ex. L, AR 203).  The Charging Letter then set out three alleged categories of such transactions: (1): a "larger number of transactions ending in same cents value;" (2): "multiple transactions were made from the accounts of individual SNAP households within a set time period;" and (3): "your store conducted EBT Transactions that are large based on the observed store characteristics and food stock."  (Id.).

Fred Conn, USDA Section Chief, was the person at USDA that made the final decision regarding whether to sanction the Market for the alleged violations in the Charging Letter. (SODF 1).  However, when asked about these categories and what was unusual, irregular and inexplicable about the Market's transactions that triggered the letter, he refused to answer or explain.  (Id. 6-13).

When Conn was asked in deposition what percentage of "same cents transactions" was "expected" by USDA, counsel objected on the basis of confidentiality of the USDA's algorithm, and Conn refused to answer the question.  (Id. 9).  When asked "what percentage of 98 cents occurring is abnormal to the FNS," counsel again objected and Conn refused to answer.  (Id. 10). When asked about what pattern of store visit activity is "usual" and "unusual" to the USDA, counsel objected, and Conn refused to answer the question.  (Id. 11).  When asked what transactions are "too large" for purposes of SNAP, counsel objected, and Conn refused to answer the question.  (Id. 12).  When asked what was "suspicious" about the Market's "large transactions", counsel objected, and Conn refused to answer the question.  (Id. 13).

The USDA appears to propose an *ipse dixit* standard of review, which equates to, "Its wrong, suspicious, irregular, unusual or inexplicable if the USDA says it is; but, we won't tell you why."  The term "ipse dixit" means "something asserted but not proved."  In re Prempro Prod. Liab. Litig., No. MDL 4:03CV01507-WRW, 2010 WL 5663003, at *3 (E.D. Ark. Sept. 16,

7

2010) (quoting  Black's Law Dictionary 905 (9th ed. 2009)).  It is literally translated "he himself said it."  Id.  Without establishing the parameters of its definitions, the USDA should not be permitted to simply assert it has proved its position.  For this reason alone, summary judgment should be denied.

### B.     The USDA Relied Upon A Store Visit Performed By A Contractor, Rick Steen, That Contained Multiple Factual And Legal Errors, Which Create Disputed Material Facts.

In making the ultimate decision, Fred Conn relied upon both Paul Arce's Retailer Reply and Case Sanction Recommendation ("Sanction Report") and Rick Steen's 2018 Store Visit Report ("2018 Visit Report").  (Id. 32).  In fact, Conn testified that he always follows the recommendation of the Sanction Report, (id. 31), and cannot recall ever ***not following*** the recommendation of the Sanction Report in the last 4-5 years.  (Id. 33).  According to Conn, he "believe[s] that facts are true as presented to me".  (Id. 4).

However, as set forth below and in the SODF, there were multiple errors in the facts that Conn considered.  (See, e.g.,  SODF 14-30).  And, according to Conn, if the facts were wrong, that would have made a difference in his decision.  (Id. 5, "Q: Would it make a difference in your decision-making process if you found out that the store inspection or store visit report was incorrect? [objection] A: *Yes*.  Q: Okay, that would be important to you?  A: *Yes*.") (emphasis added)).

In particular, the 2018 Store Visit Report contained the following errors, false statements and mistakes:

**1.**     **Store Size:**  Steen's 2018 Store Visit Report incorrectly indicates that the Market is 1,200 square feet in size.  The actual size of the Market is 3,200 square feet.  (Id. 14.a)  This is not the first time Steen incorrectly reported the size of the Market in a report; in 2017, he stated

8

that the size was 1,800 square feet.  (Id. 14.a.i).  In 2013 he declared the store to be 2,500 square

feet, and in 2011, Steen reported that the Market was 2,200 square feet.  (Id. 14.a.ii).  When

asked why the difference, Steen admitted, "I don't know."  (Id. 14.a.iii).  When asked why he

reported 1,200 square feet in 2018 – the visit report relied upon by Conn – Steen tried to explain

as follows: "I don't know, I'm just saying I have no idea.  I don't know if I put the wrong

number in there on purpose, if that was the actual number, or I miskeyed it, I have no idea."

(Id.).

     **2.**     <u>**Storage**</u>:  In the 2018 Store Visit Report, Steen reported food storage out of

public view as "60" square feet.  (Id. 14.b).  But his store sketch shows at least three different

storage areas.  The actual storage are of the Market is 760 square feet.  (Id. 14.b.ii).  Again, this

was not the first time that Steen was wrong about the storage area.  (Id. 14.b.iii).  In 2017, in

response to the exact same question, he reported "200" square feet.  (Id.).  When asked why the

numbers were different, Steen's only explanation – even though he was using a measuring

device – was, "It's an educated guess,  You can't measure inside of a cooler."  (Id. 14.b.iv).  And

in 2011 and 2013, Steen told the USDA that Market ***did not have any*** storage space out of the

public view.  (Id. 14.b.v).  Steen's explanation – "Maybe they added a storage area that's they

didn't have prior." (Id. 14.b.vi).  The Market has always had the same amount of storage space,

something Steen admitted when he compared the store sketches from various reports.  (Id.

14.b.vii).

     **3.**     <u>**Most Expensive Items**</u>.  Steen reported to the USDA in his 2018 Store Visit

Report that the four most "expensive SNAP/EBT eligible items ($5 or higher) as follows:

Enfamil ($19.99), Pepsi ($10.99), Rieds Nacho Cheese Sauce ($9.99) and pancake mix ($6.99).

(Id. 14.c).  But this was false; the Market offers prepared hot food items ranging from $4.99 to $68.99.  (Id. 14.c.i).

These more expensive items are prepared/heated by the Market after purchase by the customer.  (Id. 14.c.ii).  According to Conn, these prepared hot food items are "eligible SNAP/EBT" items that may be sold by the Market.  (Id. 14.c.iii).  Yet, Steen used his own definition and excluded these more expensive items from his 2018 Store Visit Report.  (Id. 14.c.iv).  He testified that his definition of "eligible SNAP/EBT" does not include any item that is heated.  When asked whether he included any hot prepared items in his 2018 Store Visit Report, he responded, "Why would I?", explaining that they are not SNAP/EBT eligible.  (Id. 14.c.vi).  The result was that the 2018 Store Visit Report did not identify a large number of significantly more expensive items, some as high as $68.99 and $64.99, being sold at the Market. (Id. 14.c.vii).

4.    **On-Site Consumption of Food:**  Hot prepared food is not permitted for "on-site" consumption by the customer using SNAP benefits.  Therefore, the Market does not sell food for on-site consumption at the Market.  (Id. 14.d.i).  But Steen incorrectly indicated in his 2018 Store Visit Report that the Market *did* sell food for on-site consumption.  (Id. 14.d.iii).  Yet, he admitted that he had no evidence to support this claim because there were no chairs, tables, counters, etc. for on-site consumption. (Id., "Q: But we have not been able to find anything in the photographs, your sketch, anywhere, that indicates there was on-site consumption here, correct? A: I guess so.").  In fact, in Steen's 2013 and 2017 Store Visit Reports indicate no on-site consumption of food.  (Id. 14.d.iv).

5.    **Meat Bundles, Seafood Specials:**  One question on the USDA store visit reports is, "Does the store sell items such as meat bundles, seafood specials, and or fruit and/or

vegetable boxes?"  (Id. 14.e).  The Market has always sold meat and seafood bundles.  (Id. 14.e.i; 54, 62).  The Market has machines to cut and grind its own meats.  (Id. 14.e.ii).  The Market provided the USDA with evidence supporting the offering and sale of these bundles and specials.  (Id. 14.e.iii).  Yet, in his 2018 Store Visit Report, Steen reports to the USDA that the Market did not sell items such as meat bundles, seafood specials, and or fruit and/or vegetable boxes.  (Id. 14.e.iv).  This despite just over a year earlier, checking the "yes" box to meat and seafood bundles in his 2017 Store Visit Report for the Market. (Id. 14.e.v).

Steen's explanation for the discrepancy was confusing at best.  At one point, he claimed, "Meat and seafood bundles, again, has changed.  The definition here in 2016 to 2017 is completely different."  (Id. 14.e.v).  When asked how it was different, he testified, "Well, basically what – what meat and seafood bundles are, we don't even count meat and seafood bundles anymore, where we used to count.  (Id. 14.e.vi).  This was counted then [2016], it's not counted now."  Even though he recognized that it was on the form, he went on to explain, "It might list that they have them, but we don't do any food counts."  (Id. 14.e.vii).

In the end, Steen testified, "But it's basically not, it doesn't matter."  (Id. 14.e.viii).  Steen then went on to testify about the 2018 Store Visit Report: "If I don't see any visual evidence of meat bundles, I ask the question: 'Do you sell meat bundles?'  If they say yes, I check yes.  If they say no, I check no. And then If I don't see any evidence, that's my audit."  (Id. 14.e.ix).  When asked whether he could remember asking the Market whether it sold meat and seafood bundles, Steen admitted, "Well, I have no way of knowing. I don't remember.  I'm not going to have  no way of knowing whether I specifically asked the question on this store.  I do a lot of audits."  (Id. 14.e.x).

The idea that Steen would be asking question is inconsistent with his testimony regarding his standard audit process.  He testified that he does not ask owners to participate in the process with him.  (Id. 14.e.xi).  He then explained, "If someone wants to come along, I will – I will mention to them you don't have to come along, you're welcome to come alone.  But I'm – here to perform an audit, not to answer your questions, and I try to explain to them that if you're answering my questions it could be a distraction and I might miss something on this audit."  (Id. 14.e.xii).  Rick Steen did not ask if the Market sold meat or seafood bundles during his July 31, 2018 inspection.  (Id. 14.e.xiii).   The Market has always sold meat and seafood bundles.  (Id.). If Steen had asked, the Market would have said yes.

6.  **Shopping Carts and Baskets.**  Another question on the inspection report is whether shopping carts and baskets are available for customer use.  In his 2018 Store Visit Report, Steen reported "no" shopping carts, and reported that only one basket was available.  (Id. 14.f.i).  The Market has three shopping carts and more than 10 baskets available.  (Id. 14.f.ii). Steen also admitted that the number of shopping baskets he indicates on a report is "an educated guess".  (Id. 14.f.iv).  "In the photos, if you see one, that – that doesn't really mean anything. They could have shopping baskets scattered everywhere.  There could be shoppers using shop baskets."  (Id.).  Yet in his 2018 Store Visit Report, Steen indicated only one shopping basket because he took a picture of the one and never did ask if there were others.  (Id. 14.f.v).

7.  **Empty Shelves.**  Steen reported in his 2018 Store Visit Report that there were "empty shelves" at the Market, but he could not explain why he said that to the USDA.  Steen admits that none the pictures he took as part of his inspection of the Market indicate empty shelves ("I don't see any in the photographs").  (Id. 14.g).

**C.**     **Paul Arce Relied Upon Steen's Erroneous 2018 Visit Report to Prepare The Sanction Report Delivered to Conn.**

The existence of the many mistakes in Steen's 2018 Store Visit Report are important because Paul Arce relied upon the 2018 Store Visit Report in preparing his Sanction Report to Fred Conn.  (Id. 15).  For example, in the Sanction Report, Arce stated that, "The contractor [Steen] noted Euclid Market, Inc. does ***not*** offer bulk items or grocery/meat deals, bundles, specials such as 100 party wings for $64.99 or 100 whole wings for $68.99."  (Id. 16).  This, obviously, was an incorrect statement based upon Steen's failure to include the hot/prepared food items in his 2018 Store Visit Report.  (Id. 14.c.ii – 14.c.vii).  Arce stated further, "The store photographs do not reveal any signage or advertisements for these two wing specials."  (Id. 17).  This also was false.  Finally, Arce stated, "The previously contracted visit conducted 04/05/2017 reveals the store did offer these bundles and were made to order.  The photographs for this visit also do not reveal any signage of advertisement for these wing specials."  (Id. 18).  This too was false.  (Id.).

In the Sanction Report, Arce noted and relied upon Steen's 2018 Store Visit Report, repeating, "The store survey also indicated there is only one shopping basket available for customer use and Mr. Mahmoud's photographs do not reveal any additional shopping baskets or carts."  (Id. 19).  This too was false.  Steen never even counted after seeing one basket.  (Id. 14.f.v).  But more importantly, the Market had in fact submitted photographs showing shopping carts and baskets to Arce.  (Id. 20).  The Market had three shopping carts and 10 baskets.

From these false statements, Arce drew the following erroneous conclusions as part of his Sanction Report,

> The transactions cited in this attachment [Attachment 1] normally would consist of multiple food products being purchased together in one

13

transaction.  Customers purchasing large quantities of food items would
have to hold them in their arms or enlist the help of others while shopping.

(Id. 21).  It is obvious Arce did know about the carts and baskets.

Again, relying upon Steen's 2018 Store Visit Report, which described a store of only

1,200 square feet and only 60 square feet of storage, Arce made the following conclusion in the

Sanction Report:  "The transactions noted in Attachment 2 are questionable not because they

exceed any limits for use, but rather because they display characteristics of use inconsistent with

the nature and extent of a convenience store's stock and facilities and are thus indicative of

SNAP trafficking."  (Id. 22).  The truth is the Market was almost three times as large as Steen

had reported – more than 3,200 square feet.  (Id. 14.a).  The Market had 760 square feet of

freezer, cooler and storage space. Clearly Arce was describing a store much different from the

one that in fact exists.

Arce stated in his Sanction Report to Conn, "The contractor [Steen] noted that the four

most expensive EBT items are infant formula, (nacho) cheese sauce, pancake mix, and

carbonated beverages;…"  (Id. 14.c).  As noted above, this was false because Steen failed to

include the hot prepared food items in his Report.  (Id. 14.c.i – 14.c.vii).  There were many items

more expensive than these, dozens of items ranging from $19.99 to $68.99.

And Arce suggested in his Sanction Report that the Market did not offer hot prepared

food items.  "There is no evidence to support Mr. Mahmoud's contention that this service is

available to the customers."  (Id. 24).  But Arce also admitted that he "didn't have a concrete

understanding what was going on at the store.  (Id. 24).  The fact is, the Market has always

offered hot prepared items whereby the customer purchases a product and then as a courtesy,

the Market cooks or heats the item, and this is entirely proper under the SNAP Program. (Id.

14.e.i – 14.e.iii).

14

**D.    Fred Conn Admitted That Mistakes Like These, If He Had Known About Them At The Time Of The Decision, Would Have Made  A Difference Because They Would Change The Totality of The Evidence.**

The consequences of Steen's failure to provide an accurate report were then multiplied when Conn received and relied upon Arce's Sanction Report.  (Id. 1).  Conn testified that, "[b]ecause of the evidence that we – I'm trying to think of the word there – the evidence that we put together indicated that more likely than not they were trafficking in SNAP Benefits."  (Id. 2). He did this based upon a "totality of the case, the totality of the evidence".  (Id. 3).  In making his decision, Conn testified that he "believe[s] that facts are true as presented to me".  (Id. 4).

But as noted above, the facts he relied upon were not true, and that is important.  Conn summarized that if the various facts set forth in Steen's Store Visit Report and Arce's Sanction Report, including shopping carts and baskets, store size, and storage space, were incorrect, it would change the "totality of the evidence."  (Id. 39).  As to the various inaccuracies, he testified as follows:

- if the number of shopping baskets and carts reported was incorrect, it would change the totality of the circumstances for purposes of his decision (id. 34);

- if the statement that the Market did not offer meat and fish bundles was incorrect, it would change the totality of the evidence for his decision (id. 35);

- he was undecided as to whether an incorrect statement about the size of the Market would make a difference in his decision (id. 36);

- he admitted that the Steen's incorrect statement that the Market sold food for on-site consumption went into his determination (id. 37); and

15

- knowing that Steen had incorrectly identified the four most expensive SNAP/EBT items for sale by the Market, would make a difference in his determination (id. 38).

The fact that Conn testified his decision might be different if he had accurate facts demonstrates that there are material facts in dispute, and summary judgment should be denied, especially where Conn testified that he had no direct evidence to the contrary.  (Id. 41).

### E.    The Comparison Stores Used In The Sanction Report Were Not Comparable.

As part of the USDA's decision to sanction the Market, Arce and Conn compared the Market's sales to those of two nearby gas stations – Crown Mart 8 and Salama Market.  (Id. 42). But Crown Mart 8 does not accept SNAP benefits from customers for hot prepared food items. (Id. 43).  The highest priced items at Crown Mart 8 were milk, chips and cereal, costing approximately $4.99.  (Id. 44).  Salama Market does not accept SNAP benefits from customers for hot prepared food items, and the highest-priced items at Salama Market are almost all less than $5.00.  (Id. 45).  Conn was not aware of this at the time of making his decision, and admitted that if the stores did not offer hot prepared foods to SNAP customers, "it is not really appropriate to compare them" to the Market, because it would not be comparing "apples to apples."  (Id. 46).  Yet, he relied upon the comparison as part of his decision.

The significance of Conn's and Arce's mistakes were crucial.  The USDA believed that all three stores sold similar items, yet only the Market sold hot prepared food items to SNAP customers and sold higher-priced items found in a small grocery store – some 10 times as expensive, like the chicken wings.  The Market sells thousands of chicken wings at $64.99 and $68.99.  This reason alone is why the Market had a higher per transaction average than Crown Mart 8 and Salama Market.  It had nothing to do with trafficking.

16

**F.    The Invoices Presented Demonstrate that The Market Purchased Inventory
Consistent with All of the SNAP/EBT Transactions.**

The USDA claims that the Market's inventory does not support the SNAP redemptions

during the six-month review period.  (Memorandum, p. 9).  But the USDA cannot identify an

average mark-up for convenience stores or small grocery stores across the country; neither Arce

nor Conn could testify to a standard mark-up.  (Arce 50:21-23; Conn 27:24-25 – 25:1-10).  Arce

simply guesses in his analysis.

At the Market, mark-ups on items varies greatly; some items, such as prepared food

items, have a substantially higher mark-up than pre-priced items or low margin items.

(Mahmoud Aff. ¶15).  The "average mark-up" at the Market, therefore, would not give you a

correct indication of the actual overall net profit on the individual items sold.  (Id. ¶¶16-18).

Because the Market sells substantially higher amounts of hot/prepared foods (much larger mark-

up), the actual net profit associated with these items would be higher overall.  (Id. ¶18). The

Market does not maintain records that would demonstrate with specificity the actual net profit

for specific items or specific categories of foods versus the overall profit and loss of the Market;

therefore, Mahmoud testified that he has estimated the average mark-up to be 30-35%.  (Id.).

But this is the average and not the actual mark-up for all items; therefore, the calculation

prepared by Arce, using a purported average is not accurate.  (Id.).

It is particularly relevant that the USDA used an overall mark-up of "50%" when it

reviewed the Market in 2017.  (SODF 87, 89).  Conn testified that there was nothing wrong with

using a 50% mark-up.  (Id. 89).  If the 50% mark-up used by the USDA in 2017 were applied

by the USDA in 2018, the inventory would more than cover the SNAP redemptions made at the

Market.  (Id. 86, 88).

Finally, Arce used net profits for a period of three months.  When the Market added up all the invoices covering the entire period of March – July 2018, and calculated the sales attributable to those invoices, it get the following numbers:

**Purchases:**

| April | May | June | July | August | Sept |
|---|---|---|---|---|---|
| $39,507 | 36,406 | 36,255 | 34,254 | 38,159 | 34,528 |

**Six-Month Total:  $219,109**

**Mark-Ups:**

$$219,109 \ \times \ 1.35 \ = \ \$295,795$$
$$219,109 \ \times \ 1.40 \ = \ \$306,751$$
$$219,109 \ \times \ 1.45 \ = \ \$317,706$$
$$219,109 \ \times \ 1.50 \ = \ \$328,662$$

Under each scenario the sales numbers are at or above the SNAP redemptions for the same period ($295,974), even excluding the smaller inventory purchases.  (Id. 86).

## II.    The Market Has Presented Direct Evidence That Its Sales Were Legitimate Transactions Of Eligible SNAP/EBT Items And Not Trafficking.

### A.    The Market's Customers Testified That They Make Large And Frequent Purchases At The Market And Do Not Engage in Trafficking.

In Arce's Sanction Report, relied upon by Conn in making his decision, Arce makes the following two arguments about customers shopping at the Market:

> The store survey [Inspection Report] and photographs do not indicate compelling reason for SNAP households to consider Euclid Market Inc. a primary destination for SNAP households to meet a majority of their grocery needs or to conduct multiple large transactions within a set period of time.

(Ex. P, AR 513)

> It is rather odd these four households travel more than one mile away from their primary residences (sic) transact more of their limited monthly allotment at Euclid Market compared to these superior options when the transaction data reveals these households are accessing and utilizing these two superior options with their superior quantity and quality of fresh and perishable staple food items compared to Euclid Market.

(Ex. P, AR 515).

But Conn admitted that no one at the USDA spoke with any person identified by the transactions.  (SODF 48).  He also admitted that SNAP beneficiaries may shop wherever they prefer, whether or not it is the cheaper store or the bigger store.  (Id.).  He also conceded that it would not be odd for a SNAP beneficiary to choose one store over another because of transportation issues, of if they felt safer at one store versus another, or if one store offered items that another did not.  (Id. 49).

Arce himself testified that he had no evidence that the Market's "quality" was inferior to any other store: "I don't have any evidence to say that the quality would be inferior compared to a supermarket or superstore."  (Id. 50)

There is substantial evidence that the Market's customers choose to shop at the Market using EBT rather than at another store for a multitude of reasons.  Most shop at a variety of stores.  Among the reasons cited by the customers:

- The proximity of the Market to their home

- Lack of regular transportation

- The Market carries most of the items they need

- They like the chicken wings

- They trust the owners

- They feel safe and the people are friendly

- The Market offers specials on meat, seafood and other items

(Id. 51).

The USDA assumed that the large transactions cited in the Charging Letter were indicative of trafficking because they were in excess of $70, but Conn admitted that the number

19

of identified large transaction was in "inordinate".  (Id. 52).  But it is undisputed that the Market's customers routinely make legitimate large purchases of eligible food items from the Market.  Tonya Thomas, a customer of the Market for the last ten years, testified that she has made purchases in excess of $130 using SNAP.  (Id. 54).  She explained, "On those occasions, I would purchase items such as chicken wings, meat bundles, meat and fish specials, prepared foods off of the menus, and many different items."  (Id.).  Sean Anthony testified to purchasing items in excess of $60, including chicken wings, meat bundles, meat and fish specials, prepared foods off of the menus.  (Id. 55).  Similarly with Michael Curry ($50) and Melanie Cotton ($45).  (Id. 56).  Each of these customers testified that they had never engaged in trafficking of SNAP benefits and had never seen anyone do so at the Market.  (Id. 57).

Despite the disbelief of the USDA, the Market's customers visit the Market multiple times in the same week, and some visit multiple times per day.  Sean Anthony, who has shopped at the Market since he was eight years old (he is thirty-one years old), testified that, "It is not unusual for me to shop at the Market 5-7 times in a week.  Sometimes I will shop at the Market 2 times in a single day.  I do this because the Market is very close to my home, the Market carries most of the items I need, and I like and trust the owners of the Market."  (Id. 58).  Mr. Anthony explained his reasons for shopping multiple times in the same day as follows: "Some of the reasons include I needed to purchase additional items, and I bought food for meal to eat that day at my home."  (Id. 59).  Tamika Cotton testified that she shops at the store multiple times in a single day "because the Market if close to my home, I do not have regular transportation to go to other stores further away, the Market carries most of the items that I need, the Market carries items that I can only get there, like chicken wings, and I like and trust the owners of the Market."

(Id. 60).  For most of the same reasons, Melanie Cotton testified that she shops at the Market "7-10 times in a week" and sometimes 2-3 times in a single day. (Id. 61).

Several customers testified that the Market offers specials for meat, seafood and other items, and that these specials change over time.  (Id. 62).  Tanya Thomas testified that she made large purchases from the specials, explaining, "During the last two years, I can specifically recall purchasing items at the Market using SNAP benefits in amounts greater than $130.  On those occasions, I would purchase items such as chicken wings, meat bundles, meat and fish specials, prepared foods off the menus, and many different items."  (Id. 61).

The Market's customers all testified that they shop at the Market and at other locations. (Id. 64).  They also testified that they continue to shop at the Market even though the Market does not now accept SNAP benefits during this appeal.  They shop at the Market for all the reasons stated above, and obviously, not to traffic in SNAP benefits (which would be impossible today). (Id. 65).

It is not possible to determine whether any of the customers that testified here are households identified in the transactions cited by the USDA.  (Id. 66).  The Market requested the identities of the households in discovery, and tried to subpoena that information from the State of Missouri.  (Id. 67).  The USDA refused to provide the information and opposed the efforts to obtain the information through subpoena.  (Id. 68).  The Court sustained the motion to quash the subpoena.  ([Doc. 23]).  Therefore, the Market has had no ability to contact specific households about specific transactions.

The USDA has asserted that three households make up the majority of the suspicious transactions.  (Ex. I, AR 197-201).  The Market believes it did identify one customer, Selena Williams, whose shopping patterns were similar to the three households identified by the USDA.

(SODF 71).  Despite what was claimed by the USDA, the shopping by Ms. Williams and her

family was entirely appropriate and completely consistent with the SNAP regulations; it was not

the result of trafficking.  (Id. 72).

Ms. Williams has 12 children.  (Id. 74).  She has trouble getting around and is without

transportation. (Id.).  Ms. Williams testified:

> The Market is very close to my home; closer than any other place to
> purchase food items.  It carries almost all of the items that my family
> needs.  In some instances, the Market carries items that I cannot get
> elsewhere.  My family likes shopping at the Market.  The owners of the
> Market are friendly, kind and helpful, and they treat my family well.
> Other stores around town, especially the gas stations, are rude to my
> children.  The Market is also a safe place for my family to shop.

(Id. 75).  She further testified:

> I have trouble getting around.  Travelling is especially difficult for me.
> Therefore, shopping close to my home is a blessing.  I also shop at other
> stores using SNAP benefits.  We buy large quantities of food items as
> might be expected.  We make these purchases sometimes several times a
> week.  My other preferred shopping place is Sav-A-Lot, but I do shop at
> Schnucks, Walmart and other places as well.  But the Market is close to
> my home and my kids do not have to travel to stores further away to get
> the things we need.

(Id. 76).  Most importantly, Ms. Williams testified that she routinely made large purchases at

the Market:

> During the years, I can specifically recall purchasing items at the Market
> using SNAP benefits in amounts greater than $200.  On those occasions, I
> would purchase items such as chicken wings, meat and fish specials,
> prepared foods off of the menu, and many different food items for my
> family.  With twelve children, even 100 chicken wings does not last long.
> Neither does a gallon of milk or a box of cereal.  That is why my family
> shops at the Market multiple times in a single day or on back-to-back
> days.  My family and I have made many purchases of $70 or more over
> the years.

(Id. 76).  Her large purchases are not indicative of trafficking; they are evidence that she is

utilizing the SNAP Program as it was intended and that the Market is an integral part of that. (Id.

22

77).  Even since the Market lost its ability to accept SNAP benefits from its customers, Ms.

Williams and her family have continued to shop at the Market.  (Id. 79).  Clearly, trafficking was

not her motivation.

> **B.** **The Market Has Submitted Register Receipts For Most Of The Transactions Demonstrating That The Transactions Were Not Trafficking.**

The Market presented register receipts from almost two-thirds of the transactions

identified in the Charging Letter.  (Mahmoud Aff. ¶19).  The Market searched, but could not

locate the additional receipts.  (Id.).  The Market did not think it would ever be in a position to

have to produce register receipts from two years ago.  (Id.).  The individual transactions are not

maintained for taxes or other reporting purposes.  (Id.).  The daily totals (the "Z Reports") are

maintained and submitted to the accountant, but not the entire rolls of thousands and thousands

of individual sales.  (Id.).

In 2017, when the USDA sought information from the Market related to questionable

transactions, the Market submitted a sampling of the register receipts for the six-month period –

approximately twenty percent of the identified transactions.  (Id. ¶20).  The USDA has never

informed the Market that it should maintain all receipts from all transactions.  (Id.).  Until this

lawsuit, it has never requested all the receipts.  (Id.).  The Market will now maintain all register

rolls going forward.  (Id.).

The register receipts that were produced – more than 100 receipts – show individual

items being purchased that are consistent with the items offered by the Market, especially the

large transaction items, identified by price on the Market's menu board. (Id. ¶21).  But there are

some items that were clearly specials and/or meat bundles because the price does not match

anything from the menu board.  (Id.).  The Market offers specials and meat bundles on a regular

basis, and they change over time.  (Id.).  The prices for the specials and meat bundles also change, depending upon what is being offered.

Fred Conn and Paul Arce both admitted that they have no evidence that the register receipts do not accurately reflect purchases of eligible items by SNAP customers.  (SODF 41.e.i).  While the Market owner's son, Abrehem Mahmoud, did honestly testify that he could not remember every individual transaction from 2018, he can testify that no one at the Market engaged in trafficking.  Therefore, not a single transaction cited by the USDA is an example of trafficking.  (Mahmoud Aff. ¶22).

The USDA states that this Court need only find a single instance of trafficking to grant summary judgment.  (Memorandum at 7).  The proposition is far too general and not applicable here, where the overwhelming "totality of the evidence" suggests that the Market never engaged in trafficking.  First, the USDA does not consider every transaction listed in the Charging Letter to be an "instance[] of trafficking" (Conn 36:11-14).  In fact, Conn admitted that USDA does not try to determine which of the transactions were instances of trafficking. (Id. at 36:15-25 – 37:6).  He admitted that he could not point to a single transaction that "was in fact an instance of trafficking" (Id.).  Therefore, it would be inappropriate for the Court to speculate as to a "single" transaction for purposes of summary judgment when the totality of the evidence supports the Market's position that it has never trafficked in SNAP benefits.

**C.     The Market Has Submitted Customer Receipts For Non-SNAP Transactions That Demonstrate The Market's Customers Do Make Large Purchases And Shop Multiple Times Per Day.**

The overall basis for the USDA's decision to disqualify the Market was that the only way to explain the transactions in the Charging Letter was trafficking.  In essence, if the customers were not receiving cash back on their SNAP redemptions, they would not shop at the

Market.  This is, simply, false.  The Market has attached credit card and debit card receipts from both large transactions and frequent transactions occurring after the Market lost its ability to accept SNAP benefits.  (Mahmoud Aff. ¶14, Exhibit 2).  These transactions demonstrate that Market customers continue to purchase items at the grocery store for large amounts of money (some in excess of $200, many above $70) and on a frequent basis – without using SNAP benefits.  The point is obvious:  If the Market's customers only engaged in large and frequent transactions in order to traffic, then the customers would cease shopping at the Market if SNAP benefits were not involved.  But they still do shop at the Market, because the Market is a small grocery store that offers a wide range of items that they want, need and enjoy.

Finally, as the register tapes indicate, most of the Market's items are priced at some dollar amount ending in .99.  This includes the higher-priced items at $64.99 and $68.99.  Tax is not included on SNAP purchases.  So when a customer purchases chicken wings with SNAP costing $64.99 or $64.99, they pay that amount.  Obviously, if they purchase a second item also ending in .99, the price of the two items will total an amount ending in .98.  There is nothing specious or suspicious about it.

These register receipts, at a minimum, call into serious doubt the USDA's base assumption that the Market does not have sufficient stock and item offerings to support larger and multiple transactions.

## <u>CONCLUSION</u>

Under the applicable standard, Plaintiff has presented this Court with a multitude of disputed facts, and therefore, summary judgment should be denied.  Euclid Market is legally entitled to present the evidence of its compliance with all SNAP regulations to the Court at trial.

WITZEL, KANZLER & DIMMITT, LLC

By: /s/ Jay L. Kanzler
      Jay L. Kanzler  #41298 (Mo)
      2001 S. Big Bend Blvd.
      St. Louis, MO 63117
      314-645-5367
      314-645-5387 (fax)
      jaykanzler@wkllc.com

      *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on September 18, 2020, a copy of the foregoing document was filed electronically with the Clerk of the Court and was served by means of the Court's Notice of Electronic Filing on the following:

Karin A. Schute
Assistant United States Attorney
Thomas F. Eagleton U.S. Courthouse
111 South Tenth Street, 20th Floor
St. Louis, MO 63102

      Jay L. Kanzler