UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EUCLID MARKET, INC.,                          )
                                              )
        Plaintiff,                            )
                                              )
        v.                                    )        Case No. 4:19-CV-1236-HEA
                                              )
UNITED STATES OF AMERICA,                     )
                                              )
        Defendant.                            )

**EUCLID MARKET, INC.'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]**

1.      Fred Conn, USDA Section Chief, was the person at USDA that made the final
decision regarding whether to sanction the Market.  (Conn 12:17-20).

2.      Conn testified that, "[b]ecause of the evidence that we – I'm trying to think of the
word there – the evidence that we put together indicated that more likely than not they were
trafficking in SNAP Benefits.  (Conn 13:15-19).

3.      He did this based upon a "totality of the case, the totality of the evidence". (Conn
24:10-11; 25:5, 25:12).

4.      Conn testified that he "believe[s] that facts are true as presented to me". (Conn
26:15-16).  However, there were multiple errors in the facts that Conn considered. (See
paragraphs 14-46 below).

5.      And, according to Conn, if the facts were wrong, that would have made a
difference in his decision.  (Conn 50:9-17, "Q: Would it make a difference in your decision-

---

[1]      The exhibits, affidavits and deposition transcripts are attached hereto and incorporated
herein.

1

making process if you found out that the store inspection or store visit report was incorrect? [objection] A: *Yes*.  Q: Okay, that would be important to you?  A: *Yes*.") (emphasis added).

## REFUSAL TO TESTIFY OR ANSWER

6.       In the Charging Letter accusing the Market with trafficking, the USDA indicated that, "Analysis of the records reveal Electronic Benefit Transfer (EBT) transactions that establish clear and repetitive patterns of unusual, irregular, and inexplicable activity for your type of firm."  (Ex. L, AR 203).

7.       The Charging Letter then set out three alleged categories of such transactions: (1): a "larger number of transactions ending in same cents value;" (2): "multiple transactions were made from the accounts of individual SNAP households within a set time period;" and (3): "your store conducted EBT Transactions that are large based on the observed store characteristics and food stock."  (Id.).

8.       However, when asked about these categories and what was irregular and unusual about the Market's transactions that triggered the letter, the USDA through Fred Conn refused to answer or explain.  (Conn 41:7-13; 42:20-25 – 43:1-4; 52:1-25 – 53:1-15; 54:7-25 – 55:1-22; 81:2-25 – 82:1-13).

9.       When Conn was asked in deposition what percentage of same cents transactions was "expected" by USDA, counsel objected on the basis of confidentiality of the USDA's algorithm and Conn refused to answer the question.  (Conn 41:7-13).

10.       When asked "what percentage of 98 cents occurring is abnormal to the FNS," counsel again objected and Conn refused to answer.  (Conn 42:20-25 – 43:1-4).

11.     When asked about what pattern of store visit activity is "usual" and "unusual" to the USDA, counsel objected and Conn refused to answer the question. (Conn 52:1-25 – 53:1-15; 54:7-25 – 55:1-22).

12.     When asked what transactions are "too large" for purposes of SNAP, counsel objected and Conn refused to answer the question.  (Conn 81:2-25 – 82:1-13).

13.     When asked what was "suspicious" about the Market's "large transactions", counsel objected and Conn refused to answer the question.  (Conn 83:3-84:1-2).

**THE STORE VISIT REPORT**

14.     The Store Visit Report performed by Rick Steen had multiple errors, mistakes and false or questionable statements of fact.  These included:

     a.     **Store Size**:  Steen's Store Visit Report indicates that the store is 1,200 square feet in size (Ex. G, AR 123); the actual size of the Market is 3,200 square feet (Ex. HH, Mahmoud Aff. ¶5).

         (i)     This is not the first time Steen incorrectly reported the size of the Market in a report; in 2017, he stated that the size was 1,800 square feet (Ex. F, AR 94).

         (ii)     In 2013 he declared the store to be 2,500 square feet (Ex. E, AR 56), and in 2011 Steen reported that the Market was 2,200 square feet (Ex. E, AR 56).  When asked why the difference, Steen admitted, "I don't know."  (Steen 202:14-16).

         (iii)     When asked why he reported 1,200 square feet in 2018 – the Store Visit Report relied upon by Conn, Steen tried to explain as follows: "I don't know, I'm just saying I have no idea.  I don't know if I put the wrong number in there on purpose, if that was the actual number, or I miskeyed it, I have no idea." (Steen 203:23-25).

b. **Storage.** In the 2018 Store Visit Report, Steen reported food storage out of public view as "60" square feet. (Ex. G, AR 124).

(i)  But his store sketch shows at least three different storage areas. (<u>Id</u>.).

(ii)  The actual storage are of the Market is 760 square feet. (Ex. HH, Mahmoud Aff. ¶5).

(iii)  Again, this was not the first time that Steen was wrong about the storage area. In 2017, in response to the exact same question, he reported "200" square feet (Ex. F, AR 95).

(iv)  When asked why the numbers were different, Steen's only explanation – even though he was using a measuring device – was, "It's an educated guess,  You can't measure inside of a cooler." (Steen 163:22-23).

(v)  And in 2011 and 2013, Steen told the USDA that Market **did not have any** storage space out of the public view (Ex. E AR 56; Ex. D, AR 34).

(vi)  Steen's explanation – "Maybe they added a storage area that's they didn't have prior." (Steen 163:15-16).

(vii)  The Market has always had the same amount of storage space. (Mahmoud Aff. ¶5), something Steen admitted when he compared the store sketches from various reports (Steen 195:17 – 196:16).

c. **Most Expensive Items.** Steen reported to the USDA that the four most "expensive SNAP/EBT eligible items ($5 or higher) as follows:  Enfamil ($19.99), Pepsi ($10.99), Rieds Nacho Cheese Sauce ($9.99) and pancake mix ($6.99).  (Ex. G, AR 124).

(i)      But this was false; the Market offers prepared hot food items ranging from $4.99 to $69.99.  (Ex. G, AR 151).

(ii)      These are items prepared/heated by the Market after purchase by the customer.  (Ex. HH, Mahmoud Aff. ¶11).

(iii)      According to Conn, these prepared hot food items are "eligible SNAP/EBT" items that may be sold by the Market.  (Conn 14:14-24).

(iv)      Yet, Steen used his own definition and excluded these more expensive items from his 2018 Store Visit Report.  (Steen 167:2-5).

(v)      In his deposition he testified that his definition of eligible SNAP/EBT does not include any item that is heated. (Id.).

(vi)      When asked whether he included any hot prepared items in his report, her responded, "Why would I?", explaining that they are not SNAP/EBT eligible.  But this is false.  (Steen 170:11-25 – 171:1-2).

(v)      The result was that the 2018 Visit Report did not report significantly expensive items as high as $68.99 being sold at the Market.  (Ex. G, AR 124).

d.      **On-Site Consumption of Food.**

(i)      The Market does not sell food for on-site consumption.  (Ex. HH, Mahmoud Aff. ¶6).

(ii)      Steen indicated in his 2018 Report that the Market *did* sell food for on-site consumption.  (Ex. G, AR 125).

(iii)      But he also admitted that he had no evidence to support this because there were no chairs, tables, counters, etc. for on-site consumption. (Steen

287:10-13, "Q: But we have not been able to find anything in the photographs, your sketch, anywhere, that indicates there was on-site consumption here, correct?  A: I guess so.").

(iv)     In fact, in Steen's 2013 and 2017 Store Visit Reports, he checked "no" to on-site consumption of food.  (Ex. C, AR 19; Ex. F, AR 96).

e.     **Meat Bundles, Seafood Specials.**  One question on the USDA store visit reports is, "Does the store sell items such as meat bundles, seafood specials, and or fruit and/or vegetable boxes?"  (see Ex. G, AR 125).

(i)     The Market has always sold meat and seafood bundles.  (Ex. HH, Mahmoud Aff. ¶7).

(iii)     The Market has machines to cut and grind its own meats.  (Id. ¶8).

(iii)     The Market provided the USDA with evidence supporting the offering and sale of these bundles and specials.  (Id. ¶3; Ex. H, AR 571-572).

(iv)     Yet, Steen's 2018 Store Visit Report checks "no" to the question, and this is what was reported to the USDA.  (Ex. G, AR 125).  However, just over a year earlier, Steen checked the box "yes" to meat and seafood bundles in his inspection report (Ex. F, AR 96).

(v)     Steen's explanation for the discrepancy was confusing at best; at one point, he claimed that "[m]eat and seafood bundles, again, has changed.  The definition here in 2016 to 2017 is completely different."  (Steen 83:6-8).

(vi)     When asked how it was different, he testified, "Well, basically what – what meat and seafood bundles are, we don't even count meat and seafood

6

bundles anymore, where we used to count.  This was counted then (2016), it's not counted now."  (Steen 83:11-14).

(vii)    Even though he recognized that it was on the form, he went on to explain, "It might list that they have them, but we don't do any food counts." (Steen 83:17-18).

(viii)    In the end, Steen testified that in 2018, "But it's basically not, it doesn't matter. (Steen 85:1-2).

(ix)    Steen then went on to testify about the 2018 Store Visit Report: "If I don't see any visual evidence of meat bundles, I ask the question: 'Do you sell meat bundles?'  If they say yes, I check yes.  If they say no, I check no. And then If I don't see any evidence, that's my audit."  (Steen 222:21-25 – 223:1).

(xii)    When asked whether he could remember asking the Market whether it sold meat and seafood bundles, Steen admitted, "Well, I have no way of knowing. I don't remember.  I'm not going to have  no way of knowing whether I specifically asked the question on this store.  I do a lot of audits." (Steen 223:21-25).

(xiii)    The idea that Steen would be asking questions is inconsistent with his testimony regarding his standard audit process: he testified that he does not ask owners to participate in the process with him. (Steen 35:12-16).

(xiv)    He then explained, "If someone wants to come along, I will – I will mention to them you don't have to come along, you're welcome to come alone.  But I'm – here to perform an audit, not to answer your questions, and I try to explain to them that if you're answering my questions it could be a distraction and I might miss something on this audit."  (Steen 59:22-25 – 60:1-3).

      (xv)    Rick Steen did not ask the owner if the Market sold meat or seafood bundles during his July 31, 2018 inspection. (Ex. HH, Mahmoud Aff. ¶9).

      f.    **Shopping Carts and Baskets.**  Another question on the inspection report is whether shopping carts and baskets are available for customer use.

      (i)    In 2018 Steen report "no" to shopping carts and reported that only one basket was available.  (Ex. G, AR123).

      (ii)    The Market has three shopping carts and more than 10 baskets available.  (Ex. HH, Mahmoud Aff. ¶10; Ex. H, AR 561-562).

      (iii)    The photographs from Steen's 2018 inspection show at least one shopping cart.  (Ex. G, AR 133).

      (iv)    He also admitted that the number of shopping baskets he indicates on a report is "an educated guess".  (Steen 149:7-9).  "In the photos, if you see one, that – that doesn't really mean anything.  They could have shopping baskets scattered everywhere.  There could be shoppers using shop baskets."  (Steen 149:3-6).

      (v)    Yet, in 2018, Steen indicated only one shopping basket because he took a photo of one, and he never asked if there were others.  (Steen 210:14-25 – 211:1-8).

      g.    **Empty Shelves.**  Steen reported in his 2018 Store Visit Report that there were "empty shelves" at the Market, but he could not explain why he said that to the USDA.; Steen admits that none the pictures he took as part of his inspection of the Market indicate empty shelves, "I don't see any in the photographs". (Steen 177:17-19; 178:11-13).

**THE SANCTION REPORT**

15.     Paul Arce relied upon Steen's Store Visit Reports in preparing his Retailer Reply and Case Sanction Recommendation ("Sanction Report"). (Arce 127:24-25 – 128:12-16; 194:16-21).

16.     In the Sanction Report, Arce stated that, "The contractor [Steen] noted Euclid Market, Inc. does **not** offer bulk items or grocery/meat deals, bundles, specials such as 100 party wings for $64.99 or 100 whole wings for $68.99." (Ex. P, AR 512).  This was false.  (Ex. HH, Mahmoud Aff. ¶¶7-8; Exs. Z-GG).

17.     Arce stated further, "The store photographs do not reveal any signage or advertisements for these two wing specials." (Id.).  This was false.  (Ex. HH, Mahmoud Aff. ¶7).

18.     Finally, Arce stated, "The previously contracted visit conducted 04/05/2017 reveals the store did offer these bundles and were made to order.  The photographs for this visit also do not reveal any signage of advertisement for these wing specials." (Ex. P, AR 512).  This too was false.  Steen's own photographs show the specials.  (Ex. G, AR 133, 151).

19.     In the Sanction Report, Arce noted and relied upon Steen's Report, repeating, "The store survey also indicated there is only one shopping basket available for customer use and Mr. Mahmoud's photographs do not reveal any additional shopping baskets or carts."  (Ex. P, AR 512).  This was false.  (Ex. HH, Mahmoud Aff. ¶10).

20.     As noted above, this was false, and Mr. Mahmoud had in fact submitted photographs showing shopping carts and baskets to Arce. (Ex. H, AR 561-562; Ex. HH, Mahmoud Aff. ¶3).

21.    Arce drew the flowing erroneous conclusion a part of his Sanction Report,

"The transactions cited in this attachment [Attachment 1] normally would

consist of multiple food products being purchased together in one

transaction.  Customers purchasing large quantities of food items would

have to hold them in their arms or enlist the help of others while

shopping."

(Ex. P, AR 512).

22.    Relying upon Steen's Report, which described a store of only 1,200 square

feet and only 60 square feet of storage, Arce made the following conclusion I the

Sanction Report:

"The transactions noted in Attachment 2 are questionable not because they

exceed any limits for use, but rather because they display characteristics of

use inconsistent with the nature and extent of a convenience store's stock

and facilities and are thus indicative of SNAP trafficking."

(Id. at AR 513).

23.    In fact, Arce admits that the Market submitted its own photographs of the Market

sufficiently stocked with eligible food items."  (Id.).

24.    Arce suggested in his Sanction Report that the Market did not offer hot prepared

food items.  (Id. at AR 516) ("There is no evidence to support Mr. Mahmoud's contention that

this service is available to the customers.")  (Id.).

25.    But Mr. Mahmoud stated in a letter to Arce that this is exactly what was offered

at the Market (Ex. N), and Arce admits he has no evidence to contradict (Arce 127:20-23).

Instead, when pressed, Arce admitted,

Based on my understanding I didn't have a concrete understanding what was going on at the store, but I had – I had, let's say I had an idea.

> Q:    That the – these chicken wings were being cooked after purchase, correct?

> A:    Correct.

(Arce 126:2-9).

26.    The Market has always offered hot prepared items whereby the customer purchases a product and then as a courtesy, the Market cooks or heats the item.  (Ex. HH, Mahmoud Aff. ¶11).  This is entirely proper under the SNAP Program.  (Conn 14:7-24).

27.    Arce stated in his Sanction Report to Conn that, "The contractor [Steen] noted that the four most expensive EBT items are infant formula, (nacho) cheese sauce, pancake mix, and carbonated beverages;…"  (Ex. P, AR 517).

28.    As noted above, this was false because Steen failed to include the hot prepared food items in his Report.  (Steen 167:2-5; 170:11-25 – 171:1-2).

29.    Arce made the following false statement in his Sanction Report: "There is no indication whatsoever Euclid Market Inc. offered wing specials prior to the receipt of the charge letter."  But Steen's 2018 and 2017 Reports both show evidence of wing specials being offered before the chare letter was ever delivered.  (See Ex. K, USA 0001112 and USA 0001117 (2017); and Ex. G, AR 133, 151 (2018)).

30.    And even Arce seems to admit he knew this later in the Sanction Report when he states, "There is a large menu display board that shows that Euclid Market Inc. (sic) that this store sells a large variety of hot/prepared foods and meats."  (Ex. P, AR 521).

11

**FRED CONN'S DECISION**

31.     Conn relied upon Steen's 2018 Store Visit Report in deciding that the Market did not have enough stock of staple foods.  (Conn 49:11-7).

32.     Conn received and relied upon Arce's Sanction Report. (Conn 12:17-23; 22:2-25 – 23:1-8).

33.     Conn always follows the recommendation of the Sanction Report.  (Conn 59:2-10.  Conn cannot recall ever not following the recommendation of the Sanction Report in the last 4-5 years.  (Conn 59:11-20).

34.     Conn testified that if the number of shopping baskets and carts reported was incorrect, it would change the totality of the circumstances for purposes of his decision.  (Conn 74:14-22).

35.     Conn conceded that if the statement that the Market did not offer meat and fish bundles was incorrect, it would change the totality of the evidence for his decision. (Conn 75:12-25 – 76:1-4; 85:1-4; 94:16-21).

36.     Conn was undecided as to whether an incorrect statement about the size of the Market would make a difference in his decision, stating, "Not necessarily."  (Conn 84:22-25).

37.     Conn admitted that the Steen's incorrect statement that the Market sold food for on-site consumption went into his determination.  (Conn 122:18-25 – 123:1-4).

38.     Conn testified that if Steen's 2018 Store Visit Report incorrectly stated the four most expensive SNAP/EBT items for sale by the Market, it would make a difference in the determination to sanction.  (Conn 94:22-25 – 95:1-6).

39.     Conn summarized that if the various facts set forth in Steen's Store Visit Report, including shopping carts and baskets, store size, and storage space were incorrect, it would

change the "totality of the evidence."  (Conn 119:18-26 – 120:1, "It – yeah, it would change the totality of the evidence.  Whether it changed the totality of the evidence to show that it was less likely that they were trafficking, ***I don't know.  I can't say***."))  (emphasis added).

40.     Conn testified that the USDA takes as true the evidence provided by a retailer "if it fits in with all of the other evidence that we have."  (Conn 44:14-17).

41.     Conn admitted that he had no evidence that anything submitted by the Market in response to the Charging Letter was "manufactured".  (Conn 86:10-13).

a.     **Hot Prepared Foods**.

(i)     The Market stated that it was selling eligible items for $64.99 and $68.99 (chicken wings) to SNAP beneficiaries, and Conn indicated that is not trafficking.  (Conn 51:16-25).

(ii)     When asked whether he had any evidence that the Market did not offer chicken wings at $64.99 and $68.99, Conn admitted he did not have any such evidence. (Conn 69:5-8).

(iii)     Similarly, when asked whether he had any evidence that the Market was not doing what they said – cooking or heating food after purchase – Conn said "no".  (Conn 72:3-9; 93:5-8).

b.     **Multiple Store Visits**.  The Market stated that SNAP customers came in multiple times a day to the Market.  Conn testified that he had no reason to believe this was a false statement.  (Conn 42:1-7; 56:5-13).

c.     **Large Transactions**.  Conn testified that 80 transactions out of 21,397 conducted at the Market was not "inordinate".  (Conn 65:8-11).

d.   **Comparing 2017 to 2018**.  The Market was conducting business in the same manner in 2017 as it was in 2018.

(i)   In neither year did the Market traffic in SNAP benefits.  (Mahmoud Dec. ¶4).

(ii)   Conn testified had no evidence to establish that the Market was operating differently in 2017 when the USDA refused to sanction it versus in 2018 when the USDA did sanction the market.  (Conn 79:8-11).

(iii)   In 2017, the USDA chose to take no further action against the Market in a similar investigation.  (Exs. Q, R, S, T, U, V).

e.   **Register Receipts**:  The Market has testified that it did not traffic in SNAP benefits, and that any large transaction was the result of customers purchasing eligible items for the amounts indicated. (Ex. HH, Mahmoud Aff. ¶¶ 4, 11).

(i)   Conn testified that he had no evidence to suggest that any transaction on the register receipts was not a legitimate transaction.  (See, e.g., Conn 102:10-13, 20-25; 103:1-3).

(ii)   The Market has testified that any large transaction was the result of customers purchasing eligible items for the amounts indicated. (Ex. HH, Mahmoud Aff.¶¶ 4,11).

## THE "COMPARABLE" STORES

42.   As part of the decision to sanction the Market, the USDA compared the Market's sales to those of two nearby gas stations – Crown Mart 8 and Salama Market.  (Exs. I, AR 193-197; P, AR 516).

43.   But Crown Mart 8 does not accept SNAP benefits from customers for hot prepared food items  (Ex. GG ¶4).

44.     And the highest-priced items at Crown Mart 8 are milk, cereal and chips, costing $4.99.  (Id. ¶5).

45.     Salama Market does not accept SNAP for hot/prepared food items, and the highest priced items at Salama Market are milk, chips, candy, soda and Enfamil baby formula, almost all costing less than $5.00.  (Ex. JJ, ¶¶3-5).

46.     Conn was not aware of this at the time of making his decision, and admitted that if the stores do not offer hot prepared foods to SNAP customers, "it is not really appropriate to compare them" to the Market, because it would not be comparing "apples to apples."  (Conn 94:7-14).

## THE MARKET'S CUSTOMERS

47.     In Arce's Sanction Report, relied upon by Conn in making his decision, Arce makes the following two arguments about customers shopping at the Market:

(i)     "The store survey [Inspection Report] and photographs do not indicate compelling reason for SNAP households to consider Euclid Market Inc. a primary destination for SNAP households to meet a majority of their grocery needs or to conduct multiple large transactions within a set period of time."

(Ex. P, AR 513)

(ii)     "It is rather odd these four households travel more than one mile away from their primary residences (sic) transact more of their limited monthly allotment at Euclid Market compared to these superior options when the transaction data reveals these households are accessing and utilizing these two superior options

15

with their superior quantity and quality of fresh and perishable

staple food items compared to Euclid Market."

(Ex. P, AR 515).

48.     But Conn admitted that no one at the USDA spoke with any person identified by the transactions.  (Conn 90:7:-9).  He also admitted that SNAP beneficiaries may shop wherever they prefer, whether or not it is the cheaper store or the bigger store.  (Conn 90:10-17).

49.     He also conceded that it would not be odd for a SNAP beneficiary to chose one store over another because of transportation issues, of if they felt safer at one store versus another, or if one store offered items that another did not.  (Conn 91:3-14).

50.     Arce himself testified that he had no evidence that Euclid Market's "quality" was inferior to any other store: "I don't have any evidence to say that the quality would be inferior compared to a supermarket or superstore."  (Arce 149:2-4).

51.     There is substantial evidence that the Market's customers choose to shop at the Market using EBT rather than at another store for a multitude of reasons.  Most shop at a variety of stores.  Among the reasons cited by the customers:

- The proximity of the Market to their home

- Lack of regular transportation

- The Market carries most of the items they need

- They like the chicken wings

- They trust the owners

- They feel safe and the people are friendly

- The Market offers special on meat, seafood and other items

(See generally Exs. Z - HH).

16

52.     The USDA assumed that the large transactions cited in the Charging Letter were indicative of trafficking because they were in excess of $70.  (Ex. L).  But Conn admitted that the number of identified large transactions was not inordinate.  (Conn 65:8-11).

53.     The Market's customers routinely make legitimate large purchases of eligible food items from the Market.

54.     Tonya Thomas, a customer of the Market for the last ten years, testified that she has made purchases in excess of $130 using SNAP.  (Ex. DD, ¶ 9).   She explained, "On those occasions, I would purchase items such as chicken wings, meat bundles, meat and fish specials, prepared foods off of the menus, and many different items."  (Id.).

55.     Sean Anthony testified to purchasing items in excess of $60, including chicken wings, meat bundles, meat and fish specials, and prepared foods off of the menus.  (Ex. AA, ¶9).

56.     Similarly with Michael Curry ($50) and Melanie Cotton ($45)  (Exs. EE and FF ¶9).

57.     Each of these customers testified that they had never engaged in trafficking of SNAP benefits and had never seen anyone do so at the Market.  (See generally Exs. Z - HH).

58.     Sean Anthony, who has shopped at the Market since he was eight years old (he is thirty-one years old), testified that, "It is not unusual for me to shop at the Market 5-7 times in a week.  Sometimes I will shop at the Market 2 times in a single day.  I do this because the Market is very close to my home, the Market carries most of the items I need, and I like and trust the owners of the Market,"  (Ex. AA, ¶6).

59.     Mr. Anthony explained his reasons for shopping multiple times in the same day as follows: "Some of the reasons include I needed to purchase additional items, and I bought food for meal to eat that day at my home."  (Id., ¶12).

60.     Tamika Cotton testified that she shops at the store multiple times in a single day "because the Market if close to my home, I do not have regular transportation to go to other stores further away, the Market carries most of the items that I need, the Market carries items that I can only get there, like chicken wings, and I like and trust the owners of the Market."  (Ex. BB, ¶6).

61.     Melanie Cotton testified that she shops at the Market "7-10 times in a week" and sometimes 2-3 times in a single day.  (Ex. FF, ¶¶6, 12).

62.     Several customers testified that the Market offers specials for meat, seafood and other items, and that these sp0ecials change over time.  (See, e.g., Ex. Z ¶10; Ex.BB, ¶10; Ex. DD, ¶10).

63.     Tanya Thomas testified that she made large purchases from the specials, explaining, "During the last two years, I can specifically recall purchasing items at the Market using SNAP benefits in amounts greater than $130.  On those occasions, I would purchase items such as chicken wings, meat bundles, meat ad fish specials, prepared foods off the menus, and many different items."  (Ex. DD, ¶9).

64.     The Market's customers all testified that they shop at the Market and at other locations.  (See generally Exs. Z-GG).

65.     They also testified that they continue to shop at the Market even though the Market does not now accept SNAP benefits during this appeal; they shop at the Market for all the reasons stated above, and obviously not to traffic in SNAP benefits (which would be impossible today).  (Id.).

**THE USDA REFUSED TO PROVIDE CUSTOMER IDENTIFICATION**

66.     It is not possible to determine whether any of the customers that testified here are households identified in the transactions cited by the USDA.  (Ex. HH, Mahmoud Aff. ¶13)

67.     The Market requested the identities of the households in discovery, and tried to subpoena that information from the State of Missouri.  The State moved to quash and the defendants joined. ([Doc. 16]).

68.     Plaintiff moved to compel the defendant to produce the information, and the USDA opposed the efforts to obtain the information through subpoena.  ([Docs 18-21]).

69.     The Court sustained the motion to quash the subpoena; Therefore, the Market has no ability to contact specific households about specific transactions.  ([Doc. 23]).

70.     The USDA has asserted that three households make up the majority of the suspicious transactions (Ex. I, AR 197-201).

71.     The Market believes it did identify one customer, Selena Williams, whose shopping patterns were similar to the three households identified by the USDA.  (Ex. HH, Mahmoud Aff. ¶12-13).

72.     Despite what was claimed by the USDA, the shopping by Ms. Williams and her family was entirely appropriate and completely consistent with SNAP regulations.  It was not the result of trafficking.  (Ex. CC).

73.     Ms. Williams has 12 children, has trouble getting around, does not have transportation.  (Id. at ¶8).

74.     Ms. Williams testified:

"The Market is very close to my home; closer than any other place to

purchase food items.  It carries almost all of the items that my family

needs.  In some instances, the Market carries items that I cannot get

elsewhere.  My family likes shopping at the Market.  The owners of the

Market are friendly, kind and helpful, and they treat my family well.

Other stores around town, especially the gas stations, are rude to my

children.  The Market is also a safe place for my family to shop."

(Id. ¶7).

75.    She further testified:

"I have trouble getting around.  Travelling is especially difficult for me.

Therefore, shopping close to my home is a blessing.  I also shop at other

stores using SNAP benefits.  We buy large quantities of food items as

might be expected.  We make these purchases sometimes several times a

week.  My other preferred shopping place is Sav-A-Lot, but I do shop at

Schnucks, Walmart and other places as well.  But the Market is close to

my home and my kids do not have to travel to stores further away to get

the things we need."

(Id. ¶ 8).

76.    Most importantly, Ms. Williams testified that she routinely made large purchases

at the Market:

"During the years, I can specifically recall purchasing items at the Market

using SNAP benefits in amounts greater than $200.  On those occasions, I

would purchase items such as chicken wings, meat and fish specials,

prepared foods off of the menu, and many different food items for my

family.  With twelve children, even 100 chicken wings does not last long.

20

Neither does a gallon of milk or a box of cereal.  That is why my family

shops at the Market multiple times in a single day or on back-to-back

days.  My family and I have made many purchases of $70 or more over

the years."

(Id. ¶10).

77.     Her large purchases are not indicative of trafficking, they are evidence that she is

utilizing the SNAP Program as it was intended and that the Market is an integral part of that.

Ms. Williams and her family have continued to shop at the Market even after the Market lost the

ability to accept SNAP benefits from its customers, and her receipts are attached (Id. ¶9).

78.     The Market has gathered dozens of register receipts related to purchase made by

customers of the Market.  These register receipts are attached as Ex. 2 to the Mahmoud

Affidavit (Ex. HH, Mahmoud Aff., Ex. 2).  These receipts demonstrate that Market customers

make large purchases at the Market using credit cards and debit cards, and not just when using

SNAP benefits.  Some of the transactions exceed $200.  (Id.).  Many were above $70.  (Id.).

The register receipts also demonstrate that the Market's customers frequent the Market multiple

times a day using credit cards and debits cards and not just when using SNAP benefits.  (Id.).

The reasons for these larger and multiple transactions cannot be related to trafficking because

no SNAP benefits were involved.  (Id. ¶14).

79.     Included among the households that have continued to shop at the Market is

Selena Williams.  (Ex. CC and attached receipts).

80.     The USDA cannot identify an average mark-up for convenience stores or small

grocery stores across the country; neither Arce not Conn could testify to the standard mark-up.

(Arce 50:21-23; Conn 27:24-25 – 28:1-10)).

21

81.     The mark-ups on items varies greatly; some items, such as prepared food items, have a substantially higher mark-up than pre-priced items or low margin items.  (Ex. HH, Mahmoud Aff. ¶15)

82.     The "average mark-up" at the Market, therefore, would not give you a correct indication of the actual overall net profit on the items sold.  (Id. ¶¶16-18)

83.     Because the Market sells substantially higher amounts of hot/prepared foods (much larger mark-up), the actual net profit would be higher overall.  (Id. ¶18).

84.     The Market does not maintain records that would demonstrate with specificity the actual net profit for specific items or specific categories of foods versus the overall profit and loss of the Market; therefore, Mahmoud testified that he has estimated the average mark-up to be 30-35%.  (Id.).

85.     But this is the average and not the actual mark-up for all items; therefore, the calculation prepared by Arce, is not accurate.  (Id.).

86.     Arce used net profits for a period of three months.  When I added up all the invoices for the Market covering the period of March – July 2018, and calculated the sales attributable to those invoices, I get the following numbers:

**Purchases**:

| April | May | June | July | August | Sept |
|---|---|---|---|---|---|
| $39,507 | 36,406 | 36,255 | 34,254 | 38,159 | 34,528 |

Six-Month Total:  $219,109

**Mark-Ups**:

$$219,109 \times 1.35 = \$295,795$$
$$219,109 \times 1.40 = \$306,751$$
$$219,109 \times 1.45 = \$317,706$$
$$219,109 \times 1.50 = \$328,662$$

Under each scenario the sales numbers are at or above the SNAP redemptions for the same period ($295,974), even excluding the smaller inventory purchases.  (Ex. HH, Mahmoud Aff. ¶18).

87.     The USDA used an overall mark-up of "50%" when it reviewed the Market in 2071.  (Ex. U, USA0001799).

88.     If the 50% mark-up used by the USDA in 2017 were applied by the USDA in 2018, the inventory would more than cover the SNAP purchases made at the Market.  (Ex. HH, Mahmoud Aff. ¶18).

89.     Conn specifically testified that there was nothing wrong with the USDA using the 50% mark-up.  (Conn 134:5-15).

90.     USDA does not consider every transaction listed in the Charging Letter to be an "instance[] of trafficking" (Conn 36:11-14).  In fact, Conn admitted that USDA does not try to determine which of the transactions were instances of trafficking. (Id. at 36:15-25 – 37:6).  He admitted that he could not point to a single transaction that "was in fact an instance of trafficking" (Id.).

WITZEL, KANZLER & DIMMITT, LLC


By:  /s/ Jay L. Kanzler
        Jay L. Kanzler  #41298 (Mo)
        2001 S. Big Bend Blvd.
        St. Louis, MO 63117
        314-645-5367
        314-645-5387 (fax)
        jaykanzler@wkllc.com

        *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 18, 2020, a copy of the foregoing document was filed electronically with the Clerk of the Court and was served by means of the Court's Notice of Electronic Filing on the following:

Karin A. Schute
Assistant United States Attorney
Thomas F. Eagleton U.S. Courthouse
111 South Tenth Street, 20th Floor
St. Louis, MO 63102

Jay L. Kanzler
