UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EUCLID MARKET INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:19-cv-02136-MTS |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Euclid Market, Inc. ("Euclid Market" or "the Market") operates a store in St. Louis, Missouri where it prepares hot food and also sells groceries, tobacco products, lottery tickets, and various other items. The Market was an authorized retailer in the Supplemental Nutrition Assistance Program ("SNAP" or "the Program") administered by the United States Department of Agriculture ("USDA" or "the Agency") until the USDA charged the Market with trafficking[1] SNAP benefits.

After the USDA determined that the Market had indeed committed trafficking violations, and later sustained that determination in an administrative review, Euclid Market timely filed suit in this Court against the United States seeking judicial review of the USDA's decision. The United States moved for summary judgment, Doc. [35], which the Court denied, Doc. [56]. In denying summary judgment, the Court noted that the Agency had "identified substantial evidence in support of its decision," and that the Market's evidence was "far from overwhelming," but a genuine dispute of material fact existed, which prevented summary judgment. Doc. [56] at 7 (2020 WL 6262123, at *4); *see also* Fed. R. Civ. P. 56(a). The Court subsequently held a two-day trial

---

[1] "Trafficking" is defined in part as the "buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." 7 C.F.R. § 271.2.

1

on this action. This Memorandum Opinion with the Court's findings of fact and conclusions of law follows. As explained herein, the Court concludes that Euclid Market failed to show by a preponderance of the evidence that its conduct was lawful or that the Agency's determination was invalid. Therefore, the Court will enter judgment in favor of the United States.

I.   **Findings of Fact**

1.  Euclid Market, Inc. is owned by Kaher Mahmoud and is located at 2318 North Euclid, St. Louis, Missouri.

2.  Abrahem Mahmoud is the son of the owner and works as the manager of Euclid Market.

3.  For the past four or five years, Euclid Market's hours have been 9:00 a.m. to 8:00 p.m. on Monday through Saturday and 9:00 a.m. to 5:00 p.m. on Sunday.

4.  The USDA, Food and Nutrition Service's ("FNS") Retailer Operations Branch authorized Euclid Market to participate in the Program beginning in 1997.

5.  FNS classified Euclid Market as a convenience store based on the Market's reported sales data.

6.  Euclid Market has two checkout areas, neither of which have conveyor belts, and two Electronic Benefit Transfer ("EBT") terminals.

7.  A database called the Store Tracking and Redemption System ("STARS") contains information about all the stores that are authorized to accept or have been authorized to accept SNAP benefits and any person or entity that has submitted an application for SNAP authorization.

8.  A computer program called the Anti-Fraud Locator Utilizing Retailer Electronic Transactions ("ALERT") scans all EBT transactions that are made each month by stores participating in SNAP, and the transactions that fit certain patterns show up in scans.

9.  A watch list is generated from ALERT.

10. FNS's Case Screening Branch screens stores that appear on the watch list and reviews data from ALERT to see if the store should be referred for further investigation.

11. If the Case Screening Branch refers a store for data analysis investigation, it will go to a Section Chief in the Retailer Operations Division, who then assigns a Program Specialist to review the case.

12. Euclid Market appeared in ALERT as having met patterns consistent with possible EBT trafficking violations.  Paul Arce, a Program Specialist in the Retailer Operations Divisions, was assigned to analyze the Market's EBT transaction data for the review period.

13. The review period was April 1, 2018 through September 30, 2018.

14. Arce reviewed the Market's EBT transactions, store surveys and photographs, social media postings, and information about comparator stores.  He also analyzed SNAP household shopping patterns.

15. During the review period, Euclid Market's average transaction amount was $13.83.

16. During the review period, Euclid Market's total SNAP redemptions were $295,974.24.

17. During the review period, Euclid Market's average monthly SNAP redemptions were $49,329.04.

18. Arce compared Euclid Market's EBT transactions to two stores that also fit FNS's definition of a convenience store, were located within one mile of Euclid Market, had comparable food stock, and did not have active compliance investigations at the time.  These stores were Crown Mart 8 and Salama's Market.

19. During the review period, Euclid Market had a higher average SNAP transaction amount and total dollar volume compared to Crown Mart 8 and Salama's Market.  Euclid Market's average transaction amount was $13.83 versus the two comparator stores at $4.54 and $5.99,

respectively; and the Market's total SNAP dollar volume was $295,974.24 versus the two comparator stores at $31,472.40 and $103,121.14, respectively.

20. The photographs of the stores from the store visits show that Euclid Market had food stock similar to that offered for sale at the two comparator stores.

21. During the review period, the average transaction amount for a convenience store in St. Louis City was $7.14 and for the State of Missouri was $6.47.

22. During the review period, the average SNAP redemptions for the review period for a convenience store in St. Louis City were $27,503.97 and for the State of Missouri were $13,332.20.

23. Arce determined that it was not credible that Euclid Market would have a significantly higher average SNAP transaction amount or total dollar volume given its inventory and facilities compared to the two comparator stores.

24. Euclid Market scored significantly higher in the ALERT rankings and Scan Flag Comparison compared to the two comparator stores, which is a strong indicator that trafficking was more than likely occurring at Euclid Market because the ALERT ranking measures the likelihood that violations are occurring.

25. Arce also analyzed the shopping patterns of EBT recipients who made suspicious purchases at Euclid Market during the review period.  He determined that three households were responsible for several of the scanned transactions, which he believed to be the most questionable and suspect EBT activity at Euclid Market.  These households made large purchases within short periods of time at both Euclid Market and other larger stores that offered more products, which is indicative of trafficking.

26. Based on the nature and scope of eligible food stock, the store's facilities, the store's EBT transaction data compared to that of comparator stores, and an analysis of SNAP

beneficiary households' shopping patterns, Arce concluded that the transactions in the Charge Letter are suggestive of trafficking and that there is a strong probability that the transactions are trafficking.

27. Fred Conn issued a Charge Letter to Euclid Market on February 4, 2019.

28. The Charge Letter cited to three scans that were identified as suspicious.

29. FNS charged Euclid Market with three types of violations of the SNAP regulations based upon 154 EBT transactions, which included: (1) Scan A: a large number of transactions ending in the same cents value; (2) Scan B2: multiple transactions made by individual SNAP households within a set time period; and (3) Scan F: transactions that were excessively large based on the store characteristics and food stock.

30. The Charge Letter had attachments, generated by the ALERT and STARS systems, that contained the specific EBT transactions identified in the scans.

31. In response to the Charge Letter, Euclid Market submitted to FNS documents, including a written statement, photographs, invoices, and cash register receipts for *some* of the 154 EBT transactions.

32. Arce reviewed and analyzed the invoices Euclid Market submitted in response to the Charge Letter. Arce concluded that the store did not purchase enough SNAP-eligible food stock to cover its SNAP redemptions alone.

33. Arce's invoice analysis used a 25% mark-up for retail sales but also recalculated the monthly amount of the Market's invoices for SNAP-eligible foods using a 35% and 40% mark-up. Arce concluded that even assuming the Market used the larger mark-up percentages, the Market did not purchase enough retail stock to account for its SNAP redemptions each month between April and June of 2018, let alone its SNAP redemptions plus SNAP-eligible items purchased with cash, which Arce's analysis did not include.

34. Arce reviewed Euclid Market's documentation and explanations, such as that customers frequently made large purchases of chicken wings through the Market's "you buy; we fry" policy,[2] but Arce determined that the Market did not sufficiently explain the transactions in the Charge Letter as legitimate.

35. Arce recommended permanent disqualification from the SNAP program as the sanction against the Market because the preponderance of evidence along with the lack of sufficient explanation supported the conclusion that the majority of the transactions in the attachments to the Charge Letter were trafficking.

36. Conn disqualified Euclid Market from participating in SNAP because the evidence indicated that more likely than not the Market was trafficking SNAP benefits. He based his decision on the totality of the evidence included in the Case Analysis Document, the Market's reply, and the analysis of the Market's reply.

37. FNS permanently disqualified Euclid Market from participating in SNAP on April 3, 2019.

38. An Administrative Review Officer issued a Final Agency Decision finding that there was sufficient evidence that FNS properly imposed a permanent disqualification of Euclid Market as an authorized retailer in SNAP.

39. Euclid Market sought administrative review of FNS's finding that the Market engaged in trafficking of SNAP benefits.

---

[2] SNAP recipients may not use their benefits to purchase "hot foods" or "hot food products prepared for immediate consumption." 7 C.F.R. § 271.2. To sidestep this prohibition, some SNAP authorized retailers have a policy commonly called some variation of "you buy; we fry." Customers purchase the raw or cold ingredients as groceries, and then the store, as a "courtesy," will cook or heat them for the customer to consume. The Agency admits this policy, if strictly followed, does not violate any current SNAP regulation. The Market's use of the policy is not the basis for this ruling finding the Agency's disqualification of the Market valid.

40. Euclid Market does not have a written price list for all the items sold in the store during the review period.

41. Euclid Market does not have a written list of all the periodic specials that it offered during the review period.

42. Euclid Market does not have cash register receipts for 59 of the 154 transactions identified in the Charge Letter.

43. No Euclid Market employee testified that he or she had any specific memory of the 59 transactions for which the Market does not have receipts.

44. On the cash register receipts Euclid Market did submit, only SNAP eligible items are supposed to be listed as "Grocery FT2."

45. On the submitted receipts, "F/S TOTAL" is the abbreviation for SNAP total and "F/S TEND" is the abbreviation for SNAP tendered.

46. Euclid Market was not using optical scanners during the review period. Nor did it have an integrated point-of-sale system. The cashier would indicate manually on the cash register that the item was grocery and then manually enter its price. Thus, receipts from the Market did not state the specific product purchased. Rather, they state only the price of the item and that it was a SNAP eligible grocery item.

47. Prior to the review period, Euclid Market purchased a point-of-sale system that would have allowed it to produce itemized cash register receipts. But it did not install the point-of-sale system.

48. The cash register receipts that Euclid Market did produce have very little credibility in supporting that customers purchased SNAP-eligible items in the charged transactions. They show only that a cashier entered that an item was SNAP-eligible—something the cashier would need to do, and easily could do, if he or she was trafficking through the EBT terminal.

7

49. Of the 59 transactions identified in the Charge Letter for which the Market has no cash register receipts, there is no credible evidence that shows that, by a preponderance of the evidence, the transactions were legitimate.

## II. Conclusions of Law

The USDA administers SNAP to provide nutrition benefits to needy families through an EBT card with which the recipient may purchase eligible food from authorized retailers. Retailers wishing to become authorized to accept SNAP benefits must apply and, if they meet the requisite qualifications, will receive a nontransferable certificate of approval. *See* 7 U.S.C. § 2018. Once authorized as a retailer, the establishment can accept SNAP participants' EBT cards for their purchase of "food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption . . . ." 7 C.F.R. § 271.2.

The Agency may disqualify an authorized retail store for failing to comply with the Food and Nutrition Act based on "evidence that may include facts established through on-site investigations, inconsistent redemption data, [and/or] evidence obtained through a transaction report under an electronic benefit transfer system . . . ." 7 C.F.R. § 278.6(a); *see also* 7 U.S.C. § 2021(a). Congress authorized the USDA to permanently disqualify a retailer from participating in the Program upon the first occasion of trafficking. *United States v. J & K Mkt. Centerville, LLC*, 679 F.3d 709, 712 (8th Cir. 2012) (citing 7 U.S.C. § 2021(b)(3)(B)).

The Market disputed the charges and submitted a written response, photographs, vendor invoices, select cash register receipts, and its retail food markup. The Retailer Operations Division reviewed the evidence and issued a determination letter permanently disqualifying the Market from the Program in accordance with 7 C.F.R. §§ 278.6(c) and (e)(1). The Market timely requested an administrative review of the Division's disqualification. The USDA issued a Final

Agency Decision sustaining the Division's decision to impose a permanent disqualification against the Market. The Market timely brought suit in this Court under 7 U.S.C. § 2023 challenging the Final Agency Decision permanently disqualifying the Market from participating in the Program.

### a. **Standard**

A district court reviews the permanent disqualification from the Program through "a trial de novo" to "determine" the administrative action's "validity." 7 U.S.C. § 2023; 7 C.F.R. § 279.7. In a trial de novo, the Court will "reach its own factual and legal conclusions based on the preponderance of the evidence, and [will] not limit its consideration to matters previously appraised in the administrative proceedings." *Sims v. U.S. Dep't of Agric. Food & Nutrition Serv.*, 860 F.2d 858, 862 (8th Cir. 1988). The Court, in other words, will "make an independent determination of the issues." *Ghattas v. United States*, 40 F.3d 281, 286 (8th Cir. 1994) (quoting *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 368 (1967)).

Though a disqualified retailer is entitled to a trial de novo to determine the validity of the disqualification, the Court of Appeals for the Eighth Circuit has held "that aggrieved store owners bear the burden of proof in section 2023(a) challenges." *Haynes v. U.S. Dep't of Agric., Food & Nutrition Serv.*, 106 F.3d 405, 1997 WL 31600, at *1 (8th Cir. 1997) (per curiam).[3] Other Circuits agree that the disqualified retailer must prove, "by a preponderance of the evidence, that the agency's determination was invalid." *Fells v. United States*, 627 F.3d 1250, 1253 (7th Cir. 2010); *accord Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018) (noting all courts of appeals that have addressed the issue "have placed the burden of proof on the party challenging the USDA's finding of liability" and holding "that when a store challenges the USDA's determination

---

[3] The Market notes, and the government agrees, that the Eighth Circuit has not articulated, within a reported opinion, the burden of proof in a § 2023(a) challenge. But this Court sees no reason to deviate from the standard the Eighth Circuit "h[e]ld" in *Haynes*, an unreported table decision, 1997 WL 31600, at *1, especially where all other courts of appeals that have considered the issue have used the same standard and where the parties, as here, have not articulated another standard to use.

that the store trafficked in SNAP benefits, the store bears the burden of proving by a preponderance of the evidence that its conduct was lawful"). Since even a single instance of trafficking warrants permanent disqualification, the disqualified retailer must prove that *every* trafficking transaction the USDA raised was legitimate. *See, e.g.*, *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000); *PT Nguyen, Inc. v. United States*, No. 3:18-cv-00062-JWD, 2019 WL 4601845, at *8 (M.D. La. Sept. 23, 2019); *Mansi v. United States*, No. 4:11-cv-903-ODS, 2013 WL 1189709, at *4 (W.D. Mo. Mar. 22, 2013).

### b. Discussion

The Market failed to meet its difficult burden of demonstrating *every* transaction that the USDA showed was likely[4] trafficking actually was a legitimate transaction. Failing to prove that even a single transaction of those at issue was not trafficking was enough to doom the Market's case. For 59 transactions, the Market had no evidence supporting the legitimacy of the transactions whatsoever because the Market did not even have receipts for them. And while the Market did offer general explanations that likely may explain *some* of the transactions, like the popularity of its "you buy; we fry" policy, such general explanations do not suffice to demonstrate every transaction was legitimate. *Kahin*, 101 F. Supp. 2d at 1303 (noting that while plaintiff's "explanations about the spending patterns" of certain customers "may tend to negate some of the

---

[4] While the Market has the burden here, as discussed, the Court notes that substantial evidence supports the Agency's trafficking finding. The Market's EBT date, high ALERT rankings, and Scan Flag Comparison to similar stores alone raise serious suspicion, especially when considered with the Agency's analysis of SNAP beneficiary households' shopping patterns. *See Nadia Int'l Mkt. v. United States*, 689 F. App'x 30, 33 (2d Cir. 2017) ("[I]t was entirely proper for FNS to rely on transaction data alone in making its trafficking determination."); *109 Merrick Deli Corp. v. United States*, No. 1:11-cv-00977-SLT, 2014 WL 6891944, at *4 (E.D.N.Y. Sept. 30, 2014) (noting that, like here, plaintiff offered "no legal basis for its assertion that electronic EBT transaction data, alone, cannot sustain a trafficking violation"). But what is more, the Agency showed that even if the Market had a 40% mark-up on its SNAP-eligible foods, the store did not purchase enough retail stock to account for its SNAP redemptions each month between April and June of 2018. In other words, the Market did not have the inventory to sell as much in SNAP-eligible items as EBT transaction data shows customers purchased with their SNAP benefits. And that is even excluding consideration of every SNAP-eligible item that customers bought with cash. *See 109 Merrick Deli Corp.*, 2014 WL 6891944, at *4 (noting that even *if* EBT data was not alone sufficient, the administrative record showed plaintiff's inventory could not support the suspect purchases).

inferences from the EBT data," the explanations "do not sufficiently account for all the suspicious activity"); *109 Merrick Deli Corp. v. United States*, No. 1:11-cv-00977-SLT, 2014 WL 6891944, at *4 (E.D.N.Y. Sept. 30, 2014) (noting trafficking finding "cannot [be] explain[ed] away" though "there may indeed be a conceivable" legitimate explanation that "could support some of th[e] suspicious transactions"). Thus, without cash register receipts, or any other evidence surrounding those specific transactions, the Market did not establish these 59 transactions' legitimacy. But even if the Market did have its standard receipts for these transactions, it would be of little weight due to their exceptionally generic nature.

On the transactions for which the Market provided receipts, the receipts offer little. Without optical scanners or an integrated point-of-sale system, a cashier can easily disguise trafficking by simply pushing the button that produces "Grocery FT2" on the cash register receipt.[5] Indeed, doing so would be a basic prerequisite to trafficking so that the SNAP-recipient could pay the Market with SNAP benefits. Since the cash register receipts are generic and do not contain an itemized account of the items that were purchased in each transaction, and since the Market does not maintain a price list for its retail items or have records of various specials or sales it might have had during the review period, it offers little real support that the Market sold the Grocery FT2 items marked on the receipts it does have. *See Almonte Mkt. v. United States*, No. 3:18-cv-30035-KAR, 2020 WL 93994, at *7 (D. Mass. Jan. 8, 2020) (noting generic receipts "were not sufficient to refute the inference" that transactions evinced trafficking where receipts listed all items as "grocery no tax" because they "failed to establish that customers purchased SNAP-eligible food with their EBT cards"); *Shreegi Enterprises, Inc. v. United States*, No. 1:15-cv-02232-SHR, 2018

---

[5] Here, the Court does not mean to suggest that retailers participating in the Program must have the most sophisticated check-out system, absent some regulation by the Agency to the contrary. But the Market cannot evade sanction because of its own failure to keep adequate records, especially considering the Market owned, but chose not to use, a point-of-sale system.

11

WL 1919576, at *25 (M.D. Pa. Apr. 24, 2018) (where receipts "provided no further description" beyond "non-tax" item, it "was impossible to determine" if the receipts corresponded to "valid transactions").

The evidence the Market adduced did not prove, by a preponderance of the evidence, that the agency's determination was invalid.

## CONCLUSION

As the Court of Appeals for the First Circuit has noted, the Program's efficacy "depends in large measure on the good faith of both SNAP-authorized merchants and SNAP-qualified households. The USDA is charged with ensuring that merchants and [SNAP] recipients alike color between the lines. When the evidence suggests that program rules are being flouted, agency action is appropriate. So it is here[.]" *Irobe*, 890 F.3d at 381. The Court concludes the Market did not prove by a preponderance of the evidence that its conduct was lawful; the Market did not prove that the Agency's permanent disqualification of Euclid Market from the Program was invalid. 7 U.S.C. § 2023. Accordingly, the Court will enter a judgment in favor of the United States, which will accompany this Memorandum Opinion. *See* Fed. R. Civ. P. 52, 58.

Dated this 14th Day of December, 2021.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE