# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

EUCLID MARKET, INC.,            )
                                )
              Plaintiff,        )
                                )
      v.                        )        Case No.  4:19-cv-02136-MTS
                                )
UNITED STATES OF AMERICA,       )
                                )
              Defendant.        )

## MEMORANDUM OPINION

Euclid Market, Inc. ("Euclid Market" or "the Market") operates a store in St. Louis, Missouri where it prepares hot food and also sells groceries, tobacco products, lottery tickets, and various other items.  The Market was an authorized retailer in the Supplemental Nutrition Assistance Program ("SNAP" or "the Program") administered by the United States Department of Agriculture ("USDA" or "the Agency") until the USDA charged the Market with trafficking[1] SNAP benefits.

After the USDA determined that the Market had indeed committed trafficking violations, and later sustained that determination in an administrative review, Euclid Market timely filed suit in this Court against the United States seeking judicial review of the USDA's decision.  The United States moved for summary judgment, Doc. [35], which the Court denied, Doc. [56].  In denying summary judgment, the Court noted that the Agency had "identified substantial evidence in support of its decision," and that the Market's evidence was "far from

---

[1] "Trafficking" is defined in part as the "buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone."  7 C.F.R. § 271.2.

overwhelming," but a genuine dispute of material fact existed, which prevented summary judgment.  Doc. [56] at 7 (2020 WL 6262123, at *4) (quoting *Betesfa, Inc. v. United States*, 410 F. Supp. 3d 132, 140 (D.D.C. 2019)); *see also* Fed. R. Civ. P. 56(a).  The Court subsequently held a two-day bench trial in this action.  After consideration, the Court then issued a Memorandum Opinion with its findings of fact and conclusions of law explaining why it would enter judgment in favor of the United States and against Euclid Market.  *See* Doc. [98] (2021 WL 5905962).

Euclid Market timely appealed.  On appeal, the Market argued that this Court had erred "by requiring [the Market] to produce transaction-specific evidence for every transaction raised by the USDA to meet its burden of proof."  *Euclid Mkt. Inc. v. United States*, 60 F.4th 423, 429 (8th Cir. 2023).[2]  The United States Court of Appeals for the Eighth Circuit "agree[d] with Euclid Market that such a standard is erroneous," and further concluded that this Court "applied such a standard in this case."  *Id.* ("The district court's analysis shows it applied a rule always requiring a transaction-specific rebuttal of the transactions raised by the USDA.").[3] The Court of Appeals accordingly vacated the judgment and remanded the case for further proceedings consistent with its opinion.  *Id.*  It "le[ft] the nature of the proceedings to the district court's discretion" but noted "that on appeal, Euclid Market sought a remand solely to give the district court an opportunity 'to apply the correct legal standard to the evidence.'"  *Id.* at 431 n.5.

---

[2] *Accord id.* at 428 (stating the Market argued that "the district court distorted the burden by requiring Euclid Market to produce transaction-specific evidence for each transaction raised by the USDA").
[3] *But see id.* at 431 (Shepherd, J., dissenting) (agreeing "that a store may satisfy its burden of proof with evidence that 'serves to reduce the suspicion associated with a certain pattern of transactions the USDA identified'" but dissenting because "the district court in fact applied this standard").

On remand, this Court had both parties submit proposed findings of fact and conclusions of law—consistent with their positions and with the Court of Appeals' opinion—and allowed the parties to respond to one another's proposals.[4]  The Court has carefully reviewed the Court of Appeals' opinion in this matter, both proposals submitted by the parties, the responses thereto, and the transcripts of the original hearing held in this matter.  After weighing all of the relevant, admissible evidence to determine the validity of Euclid Market's disqualification by a preponderance of the evidence, see *id.* at 430, the Court concludes Euclid Market's disqualification was valid.  The Market has not provided the Court with sufficient credible evidence to the contrary—whether it be evidence that directly rebuts multiple specific transactions the USDA raised as suspicious, evidence that serves to reduce the suspicion associated with the patterns of transactions the USDA identified, or a combination of such evidence.  *See id.*  Accordingly, the Court will enter judgment in favor of the United States.

**I.    Findings of Fact**

1.    Euclid Market, Inc. is[5] owned by Kaher Mahmoud and is located at 2318 North Euclid, St. Louis, Missouri.

2.    Abrahem Mahmoud is the son of the owner and works as the manager of Euclid Market.

3.    For the past four or five years, Euclid Market's hours have been 9:00 a.m. to 8:00 p.m. on Monday through Saturday and 9:00 a.m. to 5:00 p.m. on Sunday.

---

[4] Neither party requested to be heard any additional way.
[5] For readability, the Court uses the present tense even though some of the facts may have changed since the close of evidence.

4.      The USDA, Food and Nutrition Service's ("FNS") Retailer Operations Branch authorized Euclid Market to participate in the SNAP Program beginning in 1997.

5.      Euclid Market has two checkout areas, neither of which has conveyor belts, and two Electronic Benefit Transfer ("EBT") terminals.

6.      A database called the Store Tracking and Redemption System ("STARS") contains information about all the stores that are authorized to accept or have been authorized to accept SNAP benefits and any person or entity that has applied for SNAP authorization.

7.      A computer program called the Anti-Fraud Locator Utilizing Retailer Electronic Transactions ("ALERT") scans all EBT transactions that are made each month by stores participating in SNAP, and the transactions that fit certain patterns show up in scans.

8.      A watch list is generated from ALERT.

9.      FNS's Case Screening Branch screens stores that appear on the watch list and reviews data from ALERT to see if the store should be referred for further investigation.

10.     If the Case Screening Branch refers a store for data analysis investigation, it will go to a Section Chief in the Retailer Operations Division, who then assigns a Program Specialist to review the case.

11.     FNS properly classified Euclid Market as a convenience store, based on the Market's reported sales data, prior to the review period.

12.     Euclid Market appeared in ALERT as having exhibited patterns consistent with possible EBT trafficking violations.  Paul Arce, a Program Specialist in the Retailer Operations Division, was assigned to analyze the Market's EBT transaction data for the review period.

13.     The review period was April 1, 2018 through September 30, 2018.

14.     Arce reviewed the Market's EBT transactions, store surveys and photographs, social media postings, and information about comparator stores.  He also analyzed SNAP household shopping patterns.

15.     During the review period, Euclid Market's average transaction amount was $13.83.

16.     During the review period, Euclid Market's total SNAP redemptions were $295,974.24.

17.     During the review period, Euclid Market's average monthly SNAP redemptions were $49,329.04.

18.     Arce compared Euclid Market's EBT transactions to two stores that also properly fit FNS's definition of a convenience store.  Both these stores were located within one mile of Euclid Market, had comparable food stock, and did not have active compliance investigations at the time.  These comparator stores were Crown Mart 8 and Salama's Market.

19.     During the review period, Euclid Market had a higher average SNAP transaction amount and total dollar volume compared to Crown Mart 8 and Salama's Market.  Euclid Market's average transaction amount was $13.83 versus the two comparator stores at $4.54 and $5.99, respectively; and the Market's total SNAP dollar volume was $295,974.24 versus the two comparator stores at $31,472.40 and $103,121.14, respectively.

20.     The photographs of the stores from the store visits show that Euclid Market had food stock similar to that offered for sale at the two comparator stores.

21.     During the review period, the average transaction amount for a convenience store in St. Louis City was $7.14 and for the State of Missouri was $6.47.

22.     The average SNAP redemptions for the review period for a convenience store in St. Louis City were $27,503.97 and for the State of Missouri were $13,332.20.

23.     Euclid Market provided no credible evidence to demonstrate that it would have a significantly higher average SNAP transaction amount or total dollar volume given its inventory and facilities compared to the two comparator stores.

24.     Euclid Market scored significantly higher in the ALERT rankings and Scan Flag Comparison compared to the two comparator stores, which is a strong indicator that trafficking was more than likely occurring at Euclid Market because the ALERT ranking measures the likelihood that violations are occurring.

25.     Arce also analyzed the shopping patterns of EBT recipients who made suspicious purchases at Euclid Market during the review period.  He determined that three households were responsible for several of the scanned transactions, which he believed to be the most questionable and suspect EBT activity at Euclid Market.  These households made large purchases within short periods of time at both Euclid Market and other larger stores that offered more products, which Arce found to be indicative of trafficking.

26.     Based on the nature and scope of eligible food stock, the store's facilities, the store's EBT transaction data compared to that of comparator stores, and an analysis of SNAP beneficiary households' shopping patterns, Arce concluded that the transactions in the Charge Letter are indicative of trafficking and that there is a strong probability that the transactions are trafficking.

27.     The Court credits Arce's conclusion that the transactions in the Charge Letter are indicative of trafficking and that there is a strong probability that the transactions are trafficking.

28.     Fred Conn issued a Charge Letter to Euclid Market on February 4, 2019.

29.     The Charge Letter cited to three scans that were identified as suspicious.

30.     FNS charged Euclid Market with three types of violations of the SNAP regulations based upon 154 EBT transactions, which included: (1) Scan *A*: a large number of transactions ending in the same cents value; (2) Scan *B2*: multiple transactions made by individual SNAP households within a set time period; and (3) Scan *F*: transactions that were excessively large based on the store characteristics and food stock.

31.     The Charge Letter had attachments, generated by the ALERT and STARS systems, that contained the specific EBT transactions identified in the scans.

32.     In response to the Charge Letter, Euclid Market submitted to FNS documents, including a written statement, photographs, invoices, and cash register receipts for some of the 154 EBT transactions.

33.     Arce reviewed and analyzed the invoices Euclid Market submitted in response to the Charge Letter.  Arce concluded that the store did not purchase enough SNAP-eligible food stock to cover its SNAP redemptions alone.

34.     Arce's invoice analysis used a 25% mark-up for retail sales but also recalculated the monthly amount of the Market's invoices for SNAP-eligible foods using a 35% and 40% mark-up.[6]  Arce concluded that, even assuming the Market used the larger mark-up percentages, the Market did not purchase enough retail stock to account for its SNAP

---

[6] In Abrahem Mahmoud's deposition, he testified that the Market's mark-up rate was closer to 35%. Thus, assuming a 40% mark-up rate is more beneficial to the Market than its manager even asserted it had.

redemptions each month between April and June of 2018, let alone its SNAP redemptions plus SNAP-eligible items purchased with cash, which Arce's analysis did not include.

35.     Arce reviewed Euclid Market's documentation and explanations, such as that customers frequently made large purchases of chicken wings through the Market's "you buy; we fry" policy,[7] but Arce determined that the Market did not sufficiently explain the transactions in the Charge Letter as legitimate.  *See Euclid Mkt.*, 60 F.4th at 430, n.4.

36.     Arce recommended permanent disqualification from the SNAP program as the sanction against the Market because the preponderance of evidence along with the lack of sufficient explanation supported the conclusion that the majority of the transactions in the attachments to the Charge Letter were trafficking.

37.     Arce's testimony was credible, and the Court credits his conclusions.

38.     Conn disqualified Euclid Market from participating in SNAP because the evidence indicated that more likely than not the Market was trafficking SNAP benefits.  He based his decision on the totality of the evidence included in the Case Analysis Document, the Market's reply, and the analysis of the Market's reply.

39.     Conn's reliance on Arce's analysis and conclusion was reasonable.

---

[7] SNAP recipients may not use their benefits to purchase "hot foods" or "hot food products prepared for immediate consumption."  7 C.F.R. § 271.2.  To sidestep this prohibition, some SNAP authorized retailers have a policy commonly called some variation of "you buy; we fry."  Customers purchase the raw or cold ingredients as groceries, and then the store, as a "courtesy," will cook or heat them for the customer to consume.  The Agency admits this policy, if strictly followed, does not violate any SNAP regulation—at least none then in place.  The Market's use of the policy is not the basis for this ruling finding the Agency's disqualification of the Market valid.  That said, the Court rejects the Market's suggestion that its "you buy; we fry" policy explains away the anomalies Arce discovered.  According to Abrahem Mahmoud, many stores in the area offer a similar service.  *See* Doc. [107] at 46 (testifying that "a bunch of stores" in the area "offer prepared food for EBT," perhaps as high as "75 percent" of them).

40.     Conn's testimony was credible.

41.     FNS permanently disqualified Euclid Market from participating in SNAP on April 3, 2019.

42.     An Administrative Review Officer issued a Final Agency Decision finding that there was sufficient evidence that FNS properly imposed a permanent disqualification of Euclid Market as an authorized retailer in SNAP.

43.     Euclid Market sought administrative review of FNS's finding that the Market engaged in trafficking of SNAP benefits.

44.     Euclid Market does not have a written price list for all the items sold in the store during the review period.

45.     Euclid Market does not have a written list of all the periodic specials that it offered during the review period.

46.     Even assuming Euclid Market had a 40% mark-up rate, the Market did ***not*** purchase enough retail stock to account for its SNAP redemptions each month between April and June of 2018.  This finding includes all SNAP-eligible food items.  This calculation takes into account meat bundles the Market would offer as well as items like chicken wings and other items used to make food from the menu under the Market's "you buy; we fry" policy.

47.     Thus, from April to June 2018, shoppers redeemed more in SNAP benefits at the Market than the Market had in SNAP-eligible items.  And that calculation even *excludes* consideration of every SNAP-eligible item that customers purchased without SNAP benefits—meaning it assumes, to the Market's benefit, that not a single customer ever purchased a single SNAP-Eligible item with cash.

48.     Even if Euclid Market applied a 50% mark-up and its inventory approximately equaled its SNAP redemptions, it would not have any inventory left to support cash or debit sales of SNAP-eligible items.

49.     The Market did not purchase enough SNAP-eligible food stock to cover its SNAP redemptions.

50.     This occurrence strongly indicates that the Market was trafficking SNAP benefits.

51.     The Market produced no credible testimony or other evidence to explain away this occurrence.[8]

52.     Euclid Market keeps all of its documents related to the business for at least five years but could not produce cash register receipts for 59 of the 154 transactions identified in the Charge Letter.

53.     Abrahem Mahmoud's testimony that he provided a roll of cash register receipts to Arce that Arce did not include in the Administrative Record is not credible.

_____

[8] At trial, Abrahem Mahmoud testified that Euclid Market had additional invoices from Soulard Farmers Market documenting purchases of "produce and vegetables."  Doc. [107] at 102–03. Mahmoud claimed that he did not submit these invoices to FNS because it had a policy that it would not accept handwritten invoices.  The Court does not at all credit Mahmoud's testimony.  Both Conn and Arce testified that there was no prohibition on a store submitting handwritten invoices in response to a Charge Letter.  What is more, Euclid Market never produced any invoices from Soulard Farmers Market during discovery.  Nor did the Market offer them as evidence at trial.  Also consider Mahmoud's testimony that, prior to the review period, Euclid Market stopped participating in the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") because it required the Market to offer a certain amount of fruits and vegetables for sale, but fresh fruits and vegetables would spoil in the store because the store's customers do not buy many fruits or vegetables. *Id.* at 122–23 (testifying that, in the Market's area, "they're not big fans of fruits and vegetables," so much so that mothers with WIC vouchers for fruits and vegetables "often would tell us to throw [the vouchers] away").  Mahmoud's testimony about additional invoices does not constitute credible evidence and does not invalidate Arce's invoice analysis.

54.     No Euclid Market employee has any memory of the 59 transactions for which the Market does not have receipts.

55.     On the cash register receipts Euclid Market did submit, only SNAP eligible items are supposed to be listed as "Grocery FT2."

56.     On the submitted receipts, "F/S TOTAL" is the abbreviation for SNAP total and "F/S TEND" is the abbreviation for SNAP tendered.

57.     Euclid Market was not using optical scanners during the review period.  Nor did it have an integrated point-of-sale system.  The cashier would indicate manually on the cash register that the item was grocery and then manually enter its price.  Thus, receipts from the Market did not state the specific product purchased.  Rather, they state only the price of the item and that it was a SNAP eligible grocery item.

58.     Prior to the review period, Euclid Market purchased a point-of-sale system that would have allowed it to produce itemized cash register receipts.  Though it owned the point-of-sale system, the Market did not install it.

59.     The Market's reasons for not installing the point-of-sale system—that Mahmoud's father found it too complicated and that they feared the system could get "fried" and lose all its data—were not credible.

60.     The Market chose to have generic register receipts.

61.     The cash register receipts that Euclid Market produced have little credibility in supporting that customers purchased SNAP-eligible items in the charged transactions.  They show only that a cashier entered that an item was SNAP-eligible—something the cashier would need to do, and easily could do, if he or she was trafficking through the EBT terminal.

62.     Based in part on the misrepresentations in the 2017 Reauthorization application, response to the 2017 charge letter, and Abrahem Mahmoud's inconsistent deposition and trial testimony, the Court concludes he was not a credible witness.

63.     Mahmoud's explanations of the 2018 charged transactions lacked credibility.

64.     Mahmoud's testimony that the store never trafficked SNAP benefits was not credible.

65.     Euclid Market bought or otherwise exchanged SNAP benefits for cash or consideration other than eligible food.

## II.    <u>Conclusions of Law</u>

The USDA administers SNAP to provide nutrition benefits to needy families through an EBT card with which the recipient may purchase eligible food from authorized retailers. Retailers wishing to become authorized to accept SNAP benefits must apply and, if they meet the requisite qualifications, will receive a nontransferable certificate of approval. *See* 7 U.S.C. § 2018.  Once authorized as a retailer, the establishment can accept SNAP participants' EBT cards for their purchase of "food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption . . . ."  7 C.F.R. § 271.2.

The Agency may disqualify an authorized retail store for failing to comply with the Food and Nutrition Act based on "evidence that may include facts established through on-site investigations, inconsistent redemption data, [and/or] evidence obtained through a transaction report under an electronic benefit transfer system . . . ."  7 C.F.R. § 278.6(a); *see also* 7 U.S.C. § 2021(a).   Congress authorized the USDA to permanently disqualify a retailer from

participating in the Program upon the first occasion of trafficking.  *United States v. J & K Mkt. Centerville, LLC*, 679 F.3d 709, 712 (8th Cir. 2012) (citing 7 U.S.C. § 2021(b)(3)(B)).

Here, the Market disputed the Agency's charges and submitted a written response, photographs, vendor invoices, select cash register receipts, and its retail food markup.  The Retailer Operations Division reviewed the evidence and issued a determination letter permanently disqualifying the Market from the Program in accordance with 7 C.F.R. §§ 278.6(c) and (e)(1).  *See also* 7 U.S.C. § 2021(b)(3)(B).  The Market timely requested an administrative review of the Division's disqualification.  The USDA issued a Final Agency Decision sustaining the Division's decision to impose a permanent disqualification against the Market.  The Market timely brought suit in this Court under 7 U.S.C. § 2023 challenging the Final Agency Decision permanently disqualifying the Market from participating in the Program.

     a.  **Standard**

A district court reviews the permanent disqualification from the Program through "a trial de novo" to "determine" the administrative action's "validity."  7 U.S.C. § 2023; 7 C.F.R. § 279.7.  In a trial de novo, the Court will "reach its own factual and legal conclusions based on the preponderance of the evidence, and [will] not limit its consideration to matters previously appraised in the administrative proceedings."  *Sims v. U.S. Dep't of Agric. Food & Nutrition Serv.*, 860 F.2d 858, 862 (8th Cir. 1988).  The Court, in other words, will "make an independent determination of the issues."  *Ghattas v. United States*, 40 F.3d 281, 286 (8th Cir. 1994) (quoting *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 368 (1967)).

Though a disqualified retailer is entitled to a trial de novo to determine the validity of the disqualification, Euclid Market bears the burden of proof here.  *Euclid Mkt.*, 60 F.4th at

429; *see also Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018) (noting all courts of appeals that have addressed the issue "have placed the burden of proof on the party challenging the USDA's finding of liability"). Though the Market has the burden of proof here, this Court is cognizant that Euclid Market does *not* need to provide "transaction-specific evidence for every transaction raised by the USDA to meet its burden of proof." *Euclid Mkt.*, 60 F.4th at 429. Rather, the Court has considered the "[c]redible evidence that is relevant and admissible under the Federal Rules of Evidence . . . to determine if [Euclid Market] has met its burden to prove the agency's action was invalid." *Id.* at 429–30 (citing 7 U.S.C. § 2023(a)(15)). "This is true whether that evidence directly rebuts a specific transaction the USDA raised as suspicious" or if the evidence "serves to reduce the suspicion associated with a certain pattern of transactions the USDA identified." *Id.*

b. **Discussion**

The Market has failed to meet its burden to prove the USDA's action was invalid.

i. The USDA's data and the Market's characteristics strongly indicate the Market was trafficking SNAP benefits.

The USDA may use "inconsistent redemption data" or "evidence obtained through a transaction report under an electronic benefit transfer system" to establish "a finding of a violation" that can result in disqualification. 7 C.F.R. § 278.6(a); *accord* 7 U.S.C. § 2021(a)(2); *see also* Doc. [120] at 27 (the Market acknowledging that "transactional data from the ALERT System database may be used to detect fraud"). This data alone can be enough to support a valid trafficking determination. *See Nadia Int'l Mkt. v. United States*, 689 F. App'x 30, 33 (2d Cir. 2017) (per curiam) ("[I]t was entirely proper for FNS to rely on transaction data alone in making its trafficking determination." (citing 7 U.S.C. § 2021(a)(2)));

*Idias v. United States*, 359 F.3d 695, 698 (4th Cir. 2004) ("There can also be little question that the United States was entitled to use this sort of documentary evidence to prove that [the store] trafficked in food stamps."); *SS Grocery, Inc. v. U.S. Dep't of Agric.*, 340 F. Supp. 3d 172, 183 (E.D.N.Y. 2018) (noting nothing prohibited the USDA from "solely" relying upon EBT transaction reports).

Here, the USDA established that three ALERT scans identified suspicious patterns. Scan *A* showed a large number of transactions ending in the same cents value. Scan *B2* revealed multiple transactions were made by individual SNAP households within a set time period. And Scan *F* presented transactions that were excessively large based on the Market's characteristics and food stock. Though the USDA could have solely relied on the data or the transaction reports, here, the USDA also considered "facts established through on-site investigations." *See* 7 C.F.R. § 278.6(a). The USDA correctly found that the Market had no optical scanners, no shopping carts, and few shopping baskets.[9] It compared the Market, which, based on the information the Market provided, was classified properly as a convenience store, to similarly situated convenience stores close to the Market, and the USDA correctly determined that the Market had significantly higher average SNAP transaction amounts and total dollar volume. The Court concludes that the Market's "number of aberrational

---

[9] Federal district courts consistently have upheld trafficking determinations where stores are charged with excessively large transactions or multiple high dollar purchases in a short timeframe when the store has no optical scanners, no shopping carts, and few shopping baskets that would "facilitate the purchase of multiple items in a single transaction for the alleged large-dollar amounts." *See Almonte Mkt. v. United States*, 3:18-cv-30035-KAR, 2020 WL 93994, at *6 (D. Mass. Jan. 8, 2020); *see also, e.g.*, *K & O Food Mart v. United States Dep't of Agric.*, 3:18-cv-30026-KAR, 2019 WL 2870313, at *6 (D. Mass. July 3, 2019); *Nadia Int'l Mkt. v. United States*, 5:14-cv-00082-CR, 2015 WL 7854290, at *6 (D. Vt. Dec. 2, 2015); *109 Merrick Deli Corp. v. United States*, 1:11-cv-00977-SLT RER, 2014 WL 6891944, at *4 (E.D.N.Y. Sept. 30, 2014); *McClain's Mkt. v. United States*, 411 F. Supp. 2d 772, 774 (N.D. Ohio 2005).

transactions" were more than "adequate to ground a strong inference of trafficking, especially given the [Market's] characteristics." *See Irobe*, 890 F.3d at 380.

What the Court views as remarkably compelling is the USDA's calculation, which the Court finds to be accurate, that the Market did *not* purchase enough SNAP-eligible food stock to cover its SNAP redemptions. The Market did not maintain a written price list for all the items it sold during the review period. Nor did it keep a written list of all the periodic specials that it offered during the review period. But even assuming Euclid Market had a 40% mark-up rate, which is higher than the Market's manager testified the Market had, the Market did **not** purchase enough retail stock to account for its SNAP redemptions each month between April and June of 2018. This finding *includes* all SNAP-eligible food items including the chicken wings and other items used to make food from the menu under the Market's "you buy; we fry" policy and the other 'meat bundles.'" *See Euclid Mkt.*, 60 F.4th at 430, n.4. Put another way, the Market inexplicably sold more SNAP eligible items than it purchased from vendors. That strongly indicates that the Market was trafficking SNAP benefits.

> ii. <u>The Market has failed to present sufficient credible evidence that meets its burden to prove that the USDA's disqualification of the Market was invalid.</u>

Faced with all the foregoing, the Market's evidence falls well short of establishing that its disqualification was invalid. *See id.* at 430 ("[T]he quality and the quantity of the evidence it needs to meet its burden of proof may very well turn on the quality and the quantity of the evidence provided by the USDA that the store was trafficking.").

First, consider the receipts for the 154 transactions at issue in the Charge Letter. Euclid Market does not have cash register receipts for 59 transactions identified in the Letter. To be sure, Euclid Market did *not* need to provide transaction-specific evidence for every transaction

16

in order to prevail. *See id.* at 431.  But the Market's lack of these receipts in and of itself raises significant suspicions.  Abrahem Mahmoud testified that the Market kept receipts for five years.  So, it is odd that when the USDA flagged 154 transactions—all of which were well within the last five years—the Market had no receipts for 59 of those transactions.  Put another way, the Market represents it saves all its receipts for five years, but when the USDA questioned them on suspect transactions within the last five years, the Market lacked receipts for more than one out of every three of them.

The Market's lack of receipts for more than one third of the suspicious transactions at issue is especially odd given the reverence the Market represented it had for keeping records. Recall that Abrahem Mahmoud testified he purchased a point of sale system in 2018—prior to the review period at issue here—that would have allowed the Market to scan all of its inventory, track its profits, and produce itemized cash register receipts for each transaction. Despite owning the system, the Market affirmatively chose not to implement it.  Mahmoud testified that one of the main reasons why his father, Kaher Mahmoud, and the Market did not install the new system was, since it was electronic, they feared that, if the system crashed, the store would have no records for its transactions.  The benefit to continuing to use the old system, Abrahem Mahmoud testified, was that it produced tangible paper receipts that they saved.  But when the USDA asked to see the Market's receipts, the Market conveniently did not have more than a third of them.  And, keep in mind, these were not for random transactions. These were transactions the USDA's data showed were part of a pattern indicative of trafficking; these were transactions that looked suspicious.

But it does not stop there.  Even within the suspicious transactions the USDA identified, the most dubious of these irregular transactions just so happened to be counted among the 38%

of transactions for which the Market lacked receipts.  For example, with regard to Scan *B2*, FNS charged 56 transactions, constituting 27 sets of transactions, in which individual households made multiple purchases at the store within a short time period.  The Market does not have cash register receipts for 25 of these transactions, which includes 10 whole sets of transactions.

One of the most suspicious patterns in Scan *B2* appears in Transaction Numbers 69 through 71, in which the same household made three manual EBT purchases at Euclid Market in less than 24 hours.  These three purchases at Euclid Market were all well above the average SNAP transaction for a convenience store.  What is more, this same SNAP household made purchases at four other larger stores within 24 hours, including purchases at a superstore and supermarkets, which have a larger quantity and variety of SNAP-eligible items.  Euclid Market did not have cash register receipts for these transactions and did not offer any evidence to explain Transaction Numbers 69 through 71.

There's more.  Another suspicious pattern of transactions in Scan *B2* are Transaction Numbers 47 through 48, in which the same household made two separate purchases at Euclid Market within 40 minutes.  This odd occurrence becomes even more so considering the EBT card user made *both* of these transactions after 8:00 p.m., when Euclid Market is closed.[10]  And

---

[10] Mahmoud testified that the Market "typically closes at 8:00 pm on the dot," and that the kitchen shuts down about thirty minutes before closing time.  Thus, regardless of whether Euclid Market claims that these are "you buy; we fry" purchases or regular grocery items, the Court finds the timing of these transactions is highly suspicious.  And the timing of these transactions make them just as suspicious even if they were for "other 'meat bundles.'"  *See Euclid Mkt.*, 60 F.4th at 430, n.4.  The Market has not established that any SNAP-eligible items were purchased in these transactions.  Nor has it explained these transactions.

the Market, which keeps its records for five years, peculiarly did not have receipts for these two transactions, either.

The Market's lack of receipts spilled into Scan *F* as well.  The Market does not have cash register receipts for 31 of the excessively large transactions.  Transaction Numbers 75 and 76 are the largest transactions identified in the Charge Letter.  Transaction Number 75 was for $335.70 and Transaction Number 76 for $194.97.  That means that Transaction Number 75 was more than 4,500% higher than the average transaction of $7.14 for a convenience store in St. Louis, and Transaction Number 76 was 2,600% higher than it.  The Market—which keeps its receipts for five years—had receipts for neither transaction.

As for the transactions for which the Market provided receipts, the receipts offered little.  Without optical scanners or an integrated point-of-sale system, the Market's cashiers easily could disguise trafficking by simply pushing the button that produces "Grocery FT2" on the cash register receipt.[11]  Indeed, doing so would be a prerequisite to trafficking so that the SNAP-recipient could pay the Market with SNAP benefits through the EBT terminal. Since the cash register receipts are generic and do not contain an itemized account of the items that were purchased in each transaction, and since the Market does not maintain a price list for its retail items or have records of various specials or sales it might have had during the review period, it offers little real support that the Market sold the Grocery FT2 items marked on the receipts it does have.  *See Almonte Mkt. v. United States*, 3:18-cv-30035-KAR, 2020 WL 93994, at *7 (D. Mass. Jan. 8, 2020) (noting generic receipts "were not sufficient to refute the

---

[11] Here, the Court does not mean to suggest that retailers participating in the Program must have the most sophisticated check-out system, absent some requirement to the contrary.  But the Market cannot evade sanction because of its own failure to keep adequate records, especially considering the Market owned, but chose not to use, a point-of-sale system.

inference" that transactions evinced trafficking where receipts listed all items as "grocery no tax" because they "failed to establish that customers purchased SNAP-eligible food with their EBT cards"); *Shreegi Enters., Inc. v. United States*, 1:15-cv-02232-SHR, 2018 WL 1919576, at *25 (M.D. Pa. Apr. 24, 2018) (noting where receipts "provided no further description" beyond "non-tax" item, it "was impossible to determine" if the receipts corresponded to "valid transactions").

In addition, there are multiple instances in which Euclid Market claims that a cash register receipt it provided matches one of the USDA's charged transactions; yet, the transaction amounts, payment types, or dates do not match.  For example, in Transaction Number 64 in Scan *B2*, the household purchased $50.42 with EBT at 12:00 p.m. on September 22, 2018.  The Market claims that a cash register receipt it submitted corresponds to this transaction, but the receipt it cites has a time of 10:59 and indicates that a check and cash were the payment method, not EBT.  *See* Ex. 23 at 39.  As another example, take Transaction Number 39 in Scan *B2*.  In that transaction, the household purchased $63.93 with EBT on September 25, 2018.  The Market points to a receipt that it says substantiates this transaction, but the transaction totals are different.  The receipt shows a total of $74.74 and indicates that cash was the payment method, not EBT.  Ex. 23 at 48.  These are but two examples.

Though the Market did not need to provide transaction-specific evidence for every transaction in order to prevail, *Euclid Market*, 60 F.4th at 431, the Market also has failed to provide other credible evidence that sufficiently reduces the suspicion associated with the pattern of transactions the USDA identified.  Even if some of the Market's arguments "sound compelling in the abstract," see *Fajifarah v. United States*, 779 F. Supp. 2d 191, 207 (D. Me. 2011), their value crumbles in the face of the credible and compelling evidence that the

Market's customers redeemed more SNAP benefits than the Market had SNAP-eligible food stock.  So, when the Market "allege[s] that it regularly sold large orders of chicken wings," and "other 'meat bundles'" such that "$200-$400 orders were not uncommon," *Euclid Market*, 60 F.4th at 430 n.4, it, in the abstract, may sound like a compelling explanation to account for some of the transactions in Scan *F*.  But the chicken wings and meat purchases, which are SNAP-eligible, *were included* into the calculations showing the Market sold more SNAP-eligible items than it owned.

## CONCLUSION

"Trial courts are skilled at weighing the probative value of the evidence, making credibility determinations, and assessing whether or not a party has met its burden of proof." *Id.* at 430.  After weighing all of the relevant, admissible evidence to determine the validity of the disqualification by a preponderance of the evidence, the Court concludes the disqualification was valid.  Euclid Market has not met its burden of proof.[12]  For this reason, the Court will enter Judgment in favor of the United States and against Euclid Market.

Dated this 24th day of January 2024.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

---

[12] Not only has Euclid Market failed to meet its burden of proof that the disqualification was invalid, but, as the Court noted in its findings of fact, the Court concludes the greater weight of the evidence shows Euclid Market bought or otherwise exchanged SNAP benefits for cash or consideration other than eligible food items.